In re William Dunlap CANNON, III, Debtor.

George W. Stevenson, Trustee for William Dunlap Cannon, III, Plaintiff,

v.

J.C. Bradford & Co., J.C. Bradford Futures, Inc. and Charles Ross.

Bankruptcy No. 94–21918.
Adversary No. 96–0200.

United States Bankruptcy Court, W.D. Tennessee, Western Division.

Feb. 22, 1999.

Saul C. Belz, Michael P. Coury, Quitman R. Ledyard, Memphis, TN, for Plaintiff.

Claude O. Ramer, II, Linda G. Willis, Nashville, TN, for Defendants.

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW RE COMPLAINT FOR MONEY TO RECOVER FRAUDULENT TRANSFERS—COUNTS I–VII

and

MEMORANDUM OPINION AND ORDER RE COMPLAINT FOR MONEY DAMAGES & TO RECOVER FRAUDULENT TRANSFERS–COUNT VIII

G. HARVEY BOSWELL, Bankruptcy Judge.

On February 23, 1996, the Plaintiff in this matter, George W. Stevenson, in his capacity

as Trustee for the Debtor, filed a Complaint for Money Damages and to Recover Fraudulent Transfers from the Defendants, J.C. Bradford & Co., J.C. Bradford Futures, Inc., and Charles Ross. The complaint contained eight (8) counts of wrong-doings which allegedly occurred while the debtor was engaged in commodities trading with the defendant:

| | |
|---|---|
| Count I: | Violation of the CEA, 7 U.S.C. § 6(b), Pursuant to 7 U.S.C. § 25(a) by All Defendants; |
| Count II: | Breach of Fiduciary Duty by Ross and J.C. Bradford; |
| Count III: | Common Law Fraud by Ross and J.C. Bradford; |
| Count IV: | Gross Negligence; |
| Count V: | Violation of the Tennessee Consumer Protection Act § 47–18–109 by Ross and J.C. Bradford; |
| Count VI: | Vicarious Liability of J.C. Bradford; |
| Count VII: | Failure to Supervise by J.C. Bradford; |
| Count VIII: | Fraudulent Transfers to J.C. Bradford and Ross Pursuant to 11 U.S.C. § 548. |

J.C. Bradford filed an answer to the Plaintiff's complaint on April 18, 1996, in which they denied all of the Plaintiff's allegations. The complaint was subsequently amended on January 6, 1998, to assert additional facts learned by the Plaintiff in the discovery process. The Defendants filed an amended answer on March 4, 1998.

This Court has jurisdiction over the CEA and fraudulent conveyance claims asserted herein pursuant to 7 U.S.C. § 22(c), 28 U.S.C. § 1331, and 11 U.S.C. §§ 548 & 550. This Court has jurisdiction over plaintiff's common law and Tennessee statutory claims pursuant to 28 U.S.C. § 1367(a). This Court conducted a trial in this matter from August 24, 1998, until September 4, 1998. FED. R.BANKR.P. 7001. Pursuant to 28 U.S.C. § 157(b)(A), (H) and (O), plaintiff's fraudulent conveyance claim (Count VIII) is a core proceeding. Counts I through VII are non-core proceedings. Bradford has not consented to the entry of a final judgment with respect to any non-core proceeding. Accordingly, the Court's opinion constitutes a final order with respect to Count VIII and proposed findings of fact and conclusions of law to be submitted to the District Court with respect to the remaining counts.

## I. PARTIES AND BACKGROUND

The plaintiff, George W. Stevenson, is the duly appointed and acting trustee in bankruptcy for William Dunlap Cannon III ("Cannon"). The plaintiff brings this action to recover damages from J.C. Bradford & Company, J.C. Bradford Futures, Inc. (collectively "Bradford"), and Charles Ross, for common law fraud and pursuant to the anti-fraud and churning provisions of the Commodity Exchange Act ("CEA"), for breaches of fiduciary duty, for violations of the Tennessee Consumer Protection Act ("TCPA"), for negligent acts and omissions, and to avoid fraudulent conveyances pursuant to 11 U.S.C. § 548, all arising out of various transactions which took place in connection with a commodity trading account maintained by the debtor with the defendants.

Cannon, a former attorney, practiced law in Memphis until February 25, 1994, when this bankruptcy case was filed. Cannon practiced law full time and maintained a successful residential real estate closing practice, which averaged 120 to 150 closings per month. (Tr. at 99). At the time Cannon filed his bankruptcy case, it was revealed that Cannon had misappropriated in excess of $3,500,000 from his client escrow account. As a result of these defalcations, Cannon was indicted and pled guilty to federal criminal charges for defrauding certain financial institutions which advanced monies for real estate closings. (Trial Ex. 16). As a result, Cannon lost his law license and was sentenced to prison for approximately 42 months.

Bradford is registered as a futures commission merchant ("FCM") with the Commodity Futures Trading Commission ("CFTC"), pursuant to § 4d of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 6d and with the National Futures Association ("NFA"). An FCM is an entity which (a) solicits or accepts orders to buy or sell futures contracts or commodity options **and** (b) accepts money or other assets from customers to support such orders. (17 C.F.R. § 1.3(p); Trial Ex. 44 at 7; Tr. at 66).

Charles Ross ("Ross") is an associated person ("AP") of Bradford. An AP is an individual "who solicits orders, customers or customer funds (or who supervises persons so engaged) on behalf of an FCM ...." 17 C.F.R. § 1.3(aa) (Trial Ex. 44 at 8). Ross has been employed by Bradford since February, 1986 and has been branch manager of Bradford's Memphis office since early 1991. (Tr. at 65–66).

A commodity trading advisor ("CTA") is "any person who, for compensation or profit, engages in the business of advising others ... as to the value of or the advisability of trading in any contract of sale of a commodity for future delivery...." 17 C.F.R. § 1.3(bb)(1). Such advice includes the exercise of trading authority over a customer's account and giving advice through written publications or other media. (Trial Ex. 44, p. 8). A CTA must register with the CFTC. See 7 U.S.C. §§ 6m—6o; 17 C.F.R. § 3.10. A CTA must provide customers with a Disclosure Document, filed with the CFTC, which, inter alia, provides information which prospective clients may use to evaluate the trading skills of the CTA, and its principals, performance records, if any, for the preceding three years, and any lack of experience in directing a commodity trading account (17 C.F.R. § 4.31(a)(3)); (Trial Ex. 45 at 22).

Douglas Kitchen was employed at Bradford's Nashville headquarters as partner-in-charge of the futures department. (6/21/96 Kitchen Dep., p. 5). Kitchen was responsible for all facets of futures trading at Bradford's headquarters and in all branch offices nationwide. His duties included supervision of branch office managers' trading and managerial activities. (6/21/96 Kitchen Dep., pp. 5–7).

Thomas Henricks was the assistant director of compliance at Bradford from August, 1987 until May, 1992, when he became Bradford's director of compliance. (Henricks Dep., pp. 5–6, 9). Bradford's compliance department supervises the trading activities of its brokers, reviews customers' qualifications and suitability, and monitors communications between branch offices and brokers. (Henricks Dep., p. 11).

Kitchen, Henricks, and Roy Leslie, were among the designated compliance officers of Bradford's futures department at all material times. (6/21/96 Kitchen Dep., p. 5). From 1987 to 1990, Ray Clark also had regional supervisory authority over sales of commodities, including authority over the brokers at Bradford's Memphis branch. (Clark Dep., p. 10, line 25; p. 11, line 1). Nellie Roberts was employed in Nashville as a compliance specialist in the compliance department and was responsible for surveillance activities with respect to customer accounts, including monitoring levels of trading. (6/21/96 Kitchen Dep., p. 9; Roberts Dep., pp. 4–6; Tr. at 133).

## II. DEVELOPMENT OF THE SYSTEM

The plaintiff has alleged that the "system" described below did not provide a reasonable basis upon which Ross, Norman and Bradford could offer it to the public, either in its original solicitation or in the second solicitation of Cannon in 1992. The Court agrees with this position. The background relating to the creation and purported development of the "system" follows:

Freddie Norman ("Norman") became a licensed AP for Merrill Lynch in 1979. While at Merrill Lynch, Norman handled only non-discretionary accounts.[1] (Tr. at 646–648). While at Merrill Lynch, Norman became aware of a trading idea or technique used by a few brokers to determine entry and exit points into and out of commodity markets. The idea was based on a concept called a "breakout", which is simply a predetermined price movement from a prior benchmark price, such as the opening price of the day or the price at the prior day's close. The theory is that if the market makes a price movement of a certain amount above or below the benchmark price, then that would be an indicator of the direction in which the market

---

1. A discretionary order is one where the AP uses his own discretion to supply one or more of the following elements of a customer's order: the commodity, year and delivery month of the contract, number of contracts, price, and whether the order is to buy or sell. A nondiscretionary account is one where the broker does not exercise discretionary control with respect to any element of the order. Trial Exhibits 46 and 56, p. 15.

was going to move for some indeterminate period of time thereafter. Thus, if the market on day two opened three points above the close on day one, for example, that would be an indicator of an upward momentum. Certain Merrill Lynch brokers used the idea of a breakout from the opening range, *i.e.*, the high and low prices of the market during the first minute or less of trading, to decide whether to establish or close a position in a given market. The idea was not used as a trading system for discretionary accounts, but merely as an entry or exit position signal. (Tr. at 655–56). While at Merrill Lynch, Norman learned the parameters (*i.e.*, the predetermined amount of price movement) used by the Merrill Lynch brokers for entering or exiting the market on a breakout. (Tr. at 659–60). In 1981, Norman joined Archer Daniels Midland ("ADM"), an FCM with an office in Memphis, where he later met Ross. While at ADM, Norman did not take any educational courses or read any books on opening range breakout systems. (Tr. at 679–680). Norman had no specialized training in computers or statistics. (Tr. p. 654).

In December of 1983, Ross obtained his Series 3 license[2] and joined ADM, as an AP. (Tr. at 102–104). Prior to joining ADM, Ross had never taken any special courses relating to commodities. (Tr. at 106). Ross had no special training in computer programming, statistical analysis, or statistics. (Tr. at 106). While employed as an AP, Ross, from time to time took seminars on fundamental and technical trading of commodities. (Tr. at 106–107). While at ADM, Ross handled retail accounts for the firm, but did not handle discretionary accounts. Ross was employed with ADM until February of 1986. (Tr. at 104–105).

At the time Ross met Norman at ADM, Norman had begun paper trading and back

testing[3] a trading system based on a modification of the opening range breakout entry/exit technique which he had heard about while at Merrill Lynch. (Tr. at 114–15). As utilized by Norman, the technique contemplated that if the market price passed through a certain parameter above or below the opening range price, then a buy or sell signal would be triggered, causing a reversal of the position in the market. (Tr. at 116–17). In a reversal system, the customer is in the market at all times *i.e.*, if a customer is long one contract and the market goes through the lower end of the parameter, (*i.e.*, the sell stop), the customer closes out the one long contract by selling one short contract and then sells a *second* short contract. (Tr. at 145–46). For example, if the account was long 10 bean contracts (one contract is 5000 bushels) and the market passed through a sell signal, the reversal system would call for the customer to go short 20 bean contracts, resulting in a net short position of 10 bean contracts. Each trade generates a sales commission. Norman paper traded soybeans using a parameter of 4.25 cents above or below the opening range, a number which he had heard from brokers at Merrill Lynch. (Tr. at 118).

Norman back tested the opening range breakout idea using historical data and paper traded the system on a daily basis. Historical testing was done only on the basis of daily data, *i.e.*, the open, high, low, close and open interest information, provided by Chicago Board of Trade ("CBOT"). (Tr. at 119–20).

Ross and Norman understood that back testing on daily data had limitations which could lead to inaccurate results. The CBOT data did not include intra day data[4] and, as a result, neither Ross nor Norman knew exactly how much day trading[5] would occur based

---

**2.** Series 3 is a commodities broker license issued by the NASD, which signifies successful completion of the National Futures Commodity Examination.

**3.** "Paper trading" refers to the hypothetical trading of an account based on market data. Paper trading may be done on a contemporaneous daily basis, based on prices currently generated by the market or it may be done through "back testing" which refers to hypothetical trading conducted

on historical market data obtained from the exchanges such as the Chicago Board of Trade.

**4.** "Intra-day" data, as opposed to daily day, would include not just the high, low, open and close, but also all other trades taking place during the trading day.

**5.** Without knowing price movements throughout the day, it was impossible for Ross and Norman

on the back testing. Without knowing the extent of day trading, Ross and Norman could not be certain of whether their market positions at the close of any day (*i.e.*, long or short) were correct since the level and sequence of intra day trading was unknown. (Tr. pp. 126–27, 681–82). It is impossible to test an intra day system, *i.e.*, one which may trade more than once during the day, based on daily data. (Tr. at 1272).

While at ADM, Ross and Norman tried to paper trade their system on a daily basis with the help of their trading assistant, Mary Beth Burnett. Ross testified that this paper trading covered up to four or five commodities at different points in time over a five to eight month period. (Tr. at 122–24). Norman and Burnett testified that the paper trading was conducted for as long as two years. (Tr. 1640–46). The paper trading was performed manually, without the assistance of computers. (Tr. at 666–70).

Although no records of Burnett's paper trading were produced at trial, Ross, Norman and Burnett acknowledged the possibility that errors could have been made while keeping track of the various commodities on a daily basis by missing a trade called for by the system. (Tr. at 125, 1640–49). When Burnett started paper trading, she assumed trading positions which had already been started by Norman in paper trading records maintained by him. Burnett did not know whether or not Norman had made any prior

mistakes and, therefore, did not know whether the system was properly long or short in the market at the time she began her paper trading. (Tr. at 1648–49). The effect of missing a trade could impact the balance of the trading for that day and continually misrepresent the position which a customer's account should have been in for all subsequent trades had no mistake been made. (Tr. at 129, 666–70). This false position, in turn, would invalidate the results from subsequent trades.

The paper trading conducted by Norman and Burnett presumed that every trade would be made at the price called for by the system. Accordingly, the testing ignored the effects of slippage [6] and lock limit [7] movements, both of which can significantly affect a system's profitability. (Tr. at 130–131, 666–70). This would result in paper trades being made which could not take place in actual trading. The system also ignored when the market would "gap up" [8] or down without hitting a trading stop, which would result in a gain or loss depending on whether the system was long or short. (Tr. at 1640–46).

Notwithstanding the known deficiencies in its testing, Norman concluded, based on this paper trading, that the system was "generally profitable" and was "far better" than Norman could do on his own. (Tr. at 672). Ross considered a technical system to be successful if it had a two to one profit to loss ratio. (Tr. at 473).[9]

to know how many times the market price might pass through the breakout parameter and call for a trade to be placed. If the market price movements triggered both a buy signal and a sell signal during the same day, this would result in a "day trade". Further, the failure to include intra day data in any hypothetical test model could result in the system ending the day in the opposite position from that which intra day data would have reflected, thereby contaminating all subsequent information.

6. "Fill" is the price at which the trade would actually be executed in the real commodities market. "Slippage" is the difference between the price requested and the actual execution price of a trade in the market.

7. Certain commodity markets have daily limits on how much prices can move up or down from the preceding day's close. A "Limit move" up or

down means that the market has moved the daily limit from the preceding day's closing price. "Lock limit" means the market has moved the daily limit from preceding day's closing price and is not trading at that price. Markets can open up or down their limit. If they open up or down the limit, trades cannot be placed above the limit up price or below the limit down price.

8. A "gap" would take place when the market, on the second day, opens either higher or lower than the parameter through which it must cross to trigger a position change. As a result, the market could be trending up or down and the system would not recognize the trend so long as the daily incremental moves were less than the breakout parameter.

9. Interestingly, the proof is that neither Ross nor Norman ever traded their own account by the system. See pp. 557–58, infra.

## III. MARKETING THE SYSTEM

When Ross first started at Bradford in February of 1986, he did not immediately begin to trade discretionary accounts.[10] (Tr. at 109). Ross brought with him to Bradford the non-discretionary business which he had handled at ADM. (Tr. at 109). At the time Ross joined Bradford, he had approximately twenty to twenty-five customers, as did Norman. (Tr. at 136). Norman joined Ross at Bradford in approximately June of 1986, at Ross' suggestion.

After joining Bradford, Ross and Norman continued to paper trade their system using current data and to back trade the system using daily data from the CBOT. They did not account for slippage in their testing. (Tr. at 136–37). The paper trading and back testing was done on a one contract basis—the system would buy or sell a single contract and hold that position until the system dictated a reversal in position. The hypothetical test results generated by Ross and Norman did not "pyramid" contracts by adding successive contracts to a position that was already long or short. (Tr. at 196–97).

Shortly after Norman arrived, Ross and Norman decided they wanted to use the opening range breakout idea as a reversal trading system, rather than a market entry device, in discretionary accounts. (Tr. at 131–134, 677–78). Ross and Norman discussed their interest in marketing the system to Bradford customers with Kitchen and his assistant, Joe Wade. (Tr. at 138; 6/21/96 Kitchen Dep., p. 12). Wade and Kitchen were shown some of the testing which had been done by Ross and Norman. (Tr. at 139–42). Wade and Kitchen were aware that the testing did not take into account slippage but did not make any suggestions to Ross or Norman as to how to adjust for slippage in their testing. (Tr. at 140). Wade understood the system to be an order entry procedure which attempted to determine a daily trend and that Ross and Norman had tried to

determine whether this order entry procedure could be used as a trading system based on back testing of daily data from the CBOT. (Tr. at 1759, 1961). Ross told Wade that based on the testing, the maximum "draw down"[11] on a single contract of bonds was $5,000 to $6,000. (Tr. at 168). Ross and Norman recommended that a customer invest twice the maximum draw down, plus the margin necessary to trade their account, but in fact would execute trades for a customer who had less than that amount of money in the account. (Tr. at 168–70).

According to Henricks, Bradford's compliance department neither approves nor disapproves of the use of technical trading system strategies in discretionary accounts; nor is it qualified to nor does it make any determination as to whether the use of a technical trading system by a broker in a discretionary account is fraudulent. (Henricks Dep., pp. 41–42).

Kitchen testified that Bradford has no policy or procedure, either express or tacit, for reviewing technical trading systems prior to offering them to Bradford's customers and neither encouraged nor discouraged the development of systems by its brokers. There was no requirement that a broker notify Bradford that he or she is intending to introduce a technical trading system to the general public. (6/21/96 Kitchen Dep., pp. 10–11; Tr. at 1773–74).

Based on the meeting with Wade, Ross and Norman believed that they had approval to start marketing the system for discretionary accounts. (Tr. at 688–91). Wade stated, however, that he did not approve the use of this system. (Tr. at 1773–74). Though not asked to approve the System, Kitchen testified that, by negative inference, he tacitly approved of Ross' and Norman's utilization of the system. (6/21/96 Kitchen Dep., p. 13).

Prior to this tacit approval, neither Wade nor Kitchen undertook any role in reviewing

10. Ross would not have been eligible to trade discretionary accounts until approximately December of 1985, when he had two years experience. NFA Rule 2–8(d).

11. Drawdown is the difference between an equity high point and subsequent equity low point.

Knowledge concerning a technical system's drawdown is important, since it is an indicator of the minimum level of equity needed for a customer to trade the system. Ex. 56, p. 16. See also 17 C.F.R. § 4.10(k) & (l).

or testing the reversal system. (9/17/97 Kitchen Dep., p. 25; 6/21/96 Kitchen Dep., p. 15; Tr. 144, 1771–73). Even though Kitchen did not know whether Ross or Norman had any experience with technical trading or computerized system trading, Kitchen failed to perform any independent testing of the system and made no effort to determine whether the chosen parameters were designed to obtain the highest profits while generating the lowest commissions. (9/17/97 Kitchen Dep., pp. 25–29; 6/21/96 Kitchen Dep., p. 16). Kitchen claimed, nonetheless, that the system provided a "reasonable basis" for entering into trades. (6/21/96 Kitchen Dep., pp. 14–15). Wade was aware that the back testing was imperfect since it did not include intra day data. (Tr. at 144, 1771–73).

It was customary for Bradford to allow brokers to use Bradford letterhead to solicit customers for system trading, without having tested or approved the system. (6/21/96 Kitchen Dep., p. 24). Bradford did not verify the accuracy of the actual or hypothetical track records accompanying promotional materials disseminated to the public on Bradford letterhead. (6/21/96 Kitchen Dep., p. 25).

At the time Ross and Norman decided to trade customer accounts on the system, they agreed to become partners with respect to all system accounts and split commissions for all customers who used the system. (Tr. at 150). Ross and Norman began to market the system in approximately August 1986, although one or two customers might have used the system as early as June or July of 1986. (Tr. at 150–51). Ross and Norman solicited their own existing customers and customers of various Bradford stock brokers. (Tr. at 151–52). At the time Ross and Norman began soliciting customers, they had limited or no experience in handling discretionary accounts.[12] (Tr. at 109, 697).

Ross and Norman regarded the methodology of the trading system and its parameters as proprietary. (Tr. at 155–56). Customers who traded the system would not know prior to any trade at what price they would purchase or sell, but only that a purchase or sale would be made at a certain amount above or below the opening range. (Tr. at 156). Ross and Norman told Wade and Kitchen what the parameters were, but asked them not to disclose the parameters to any other broker. (Tr. at 157).

As part of their marketing efforts in the fall of 1986, Ross and Norman developed a form letter which was used as a marketing tool to solicit prospective clients. (Tr. at 158–59; Trial Ex. 39). The letter was approved for use by Willis, Bradford's Memphis branch office manager[13], and was sent out to more than 100 prospects. (Tr. p. 694). The letter represented to prospects that:

(a) "One can ... increase the odds of being successful by following some basic trading rules ...."

(b) Bradford's Memphis office had "developed a trading system that follows the guidelines ... mentioned above."

(c) The system "has been very successful to date in trading treasury bond and cotton futures contract."

(d) The system "is designed to trade best within volatile markets. At the present time treasury bond and cotton contracts fill the criteria."

(e) The system "requires a $20,000 minimum investment to trade one contract of each commodity in the portfolio."

(f) "[R]eturns have been exceptional to date" based on an enclosed track record.

(g) Bradford's "method of trading offers you an excellent chance to make profits in the futures market."

(h) "The key to success is having the iron discipline to follow the correct trading rules."

(i) While there may be weeks or months where there are losses, "over several

12. Had Ross and Norman been registered as CTAs, their lack of experience would have to be highlighted in the disclosure documents given to their customers. Trial Ex. 45, p. 26.

13. Bradford's policy required that the branch office manager and the compliance department approve all promotional materials. (Henricks Dep., p. 70, Leslie Dep., p. 99).

months I feel our trading system can generate significant profits."

(j) "While there is no guarantee of future success, I feel confident that we will have positive results over the long term."

(Trial Ex. 39; Tr. at 160–64).

Persons who received this letter also received daily post cards from Ross and Norman to show prospective customers how their account would have fared had they opened an account with Ross and Norman. Cannon received these postcards and, therefore, it was highly probable that he received Exhibit 39 or a letter substantially identical to it. (Tr. at 701). Based on the testimony of Cannon, Ross and Norman, it is reasonable to infer that Cannon did, in fact, receive a letter similar to Exhibit 39, along with subsequent postcards showing trading results for a hypothetical account.

The solicitation letter represented that the system worked well in volatile markets, *i.e.*, a market which has a wider than average daily range between the low and the high of the day. (Tr. at 175). The solicitation letter expressed confidence that the system would have "positive results over the long term". (Trial Ex. 39). Though the letter did not define "long term", Ross and Norman expected the system to be traded until they retired. (Tr. at 176).

Henricks testified that the October 23, 1986 promotional letter was "out of balance"[14] and that in order to make a representation of confidence in positive results over the long term, testing of the technical trading system should also be long term. (Henricks Dep., pp. 72–74). Michael Weiner, Bradford's expert, acknowledged the "poten-

tial for misleading" in the letter and conceded that the letter lacked appropriate warnings and certain necessary language. (Tr. at 1872, 1877, 1921, 1925). Kitchen had no recollection of approving Ross' and Norman's promotional material. (6/21/96 Kitchen Dep., pp. 16–17; 9/17/97 Kitchen Dep., pp. 46–47).

Although the representations made in the letter were based on testing and actual trading which Ross and Norman had conducted as of October of 1986, in fact, Ross and Norman had less than three months actual experience in trading treasury bonds and cotton futures under the system on fewer than ten customer accounts. (Tr. at 697).

Accompanying Exhibit 39 was a "track record" substantially similar to Exhibit 7, which purported to show prospective customers the actual trades which were generated by the system and the actual profit or loss generated by each trade. (Tr. at 179–180: Trial Ex. 7 at Bates No. 001473). At trial, Ross, who had great difficulty in reading the record, conceded that the track record depicted trades which could not have taken place under the reversal system. (Tr. at 271–74).[15] Because the September bond/cotton track record failed to plainly disclose the maximum draw down or the commissions charged, a prospective customer could not readily determine profitability or exposure to loss, or cost of trading, from merely looking at the exhibit[16]. (Tr. at 190–91).

In his cross-examination, Norman attempted to vouch for the accuracy of the Ex. 7 track record notwithstanding Ross' testimony that the document reflected certain trades which could not have taken place under the reversal system. On redirect, it was established that the sequestration rule had been

14. NFA Rule 2–29(a) provides that "No member ... shall make any communication with the public which: (1) operates as a fraud or deceit ..." Rule 2–29(b) imposes similar requirements with respect to promotional material and requires that promotional material be balanced, *i.e.*, that possibility of profit be countered by equally prominent possibility of loss, that the validity of hypothetical performance results be demonstrable, and that statements of opinion be identifiable as such and have a reasonable basis in fact. Bradford's internal policy contains similar requirements. (Henricks Dep., pp. 92–93; Trial Ex. 6).

15. If Ross, a commodities broker and branch manager with years of experience, was unable to explain why the system would generate certain trades depicted on the track record, it would be unreasonable to believe that customers such as Cannon could understand how the system would work based on this track record.

16. This track record also fails to contain a disclaimer that past results are not necessarily indicative of future results as required by NFA Rule 2–29(b)(4).

violated with respect to Exhibit 7 at Bates No. 001473, and that Ross' prior questioning about that document had been discussed with Norman prior to Norman's testimony. (Tr. at 800–801, 817–22). Norman's testimony on the accuracy, or lack thereof, of the subject track record lacks credibility. Even if Norman's explanation were true, however, the track record would still be misleading to the average prospective customer who would not have been privy to the subtleties of Bradford's internal accounting procedures.

## IV. SOLICITATION OF CANNON

Cannon was solicited by Ross and Norman through an introduction from T.W. Jones, a Bradford stockbroker, in October of 1986. (Tr. at 197). Cannon met with Norman and was told about a commodity trading system which had been developed by Ross and Norman. Cannon was shown a track record for bonds and a hypothetical track record for 1983–84 soybeans [17] which showed an impressive (100–200%) rate of return. (Tr. at 1018–19). Cannon discussed the information contained in Exhibit 39 with Norman, including rules for trading the system. Cannon was told that in order to be successful in trading the system, he had to be disciplined, follow the system, and take every trade. (Tr. at 1019). Cannon was told that he would have to trade the system over a long term and that, while he could have substantial losses, he could make big money if he stuck with the system and had sufficient funds to survive the losses. (Tr. at 1020, 1026–28).

Cannon understood that Norman had come from Merrill Lynch and was an expert on the system, and that Ross had a strong background in fundamental trading. (Tr. at 1022–23). Cannon understood that the combined expertise of Ross and Norman was advantageous, and he believed both men were experienced commodities traders. (Tr. at 1023). Cannon did not understand how the system had been developed or tested.

Cannon was told that the system was supposed to limit his losses and let his profits run. (Tr. at 1024). Cannon was told that the system would have more losing trades than winning trades, but that the winning trades should generate approximately twice as much as the losing trades. Cannon believed that, over time, he should make good money because the system would let the profits run and limit losses. It was represented to Cannon that the system had been very successful in actual trading. (Tr. at 1026–28; Trial Ex. 39). Cannon believed that the system reduced the risk of losing money if it was traded with "iron discipline" and the customer had sufficient money to trade the system over the long term. (Tr. at 1124).

Cannon understood that Ross and Norman would select which market to trade in and when to start trading that market. Cannon understood that Ross and Norman would set parameters and that the system would reverse his position if the market price hit the parameter. Cannon did not understand how the hypotheticals were developed. Ross and Norman did not explain the concept of slippage, day trades or limit moves or their effect on the system. (Tr. at 1026–28, 1030,-1037).

Cannon executed his commodity and options account application and customer agreement on October 22, 1986. The application reflected that Cannon had an annual income of more than $250,000 and a net worth, excluding his home, of between $500,-000 and $1,000,000 and that Cannon had no prior experience in trading commodities.[18] (Trial Ex. 1). Though Cannon had prior experience trading securities, he was not a sophisticated commodities investor. *See, e.g. McAnally v. Gildersleeve,* 16 F.3d 1493 (8th Cir.1994)(prior experience with stocks and bonds did not preclude finding that plaintiff was not sophisticated trader).

---

17. Ross previously testified that prospective customers were shown a hypothetical soybean track record for 1983–1984 similar to Exhibit 40. At trial, Ross testified that he was confused in his prior testimony and that no hypothetical track record was shown, but only an actual track record. (Tr. at 182–84).

18. Prior to opening his account with Bradford in 1986, Cannon had no academic training in the commodity markets nor any experience trading commodities but had some limited experience investing in securities. (Tr. at 995–96; Exhibit 1).

Ross and Norman understood that Cannon did not have a sophisticated knowledge of commodity markets. (Tr. at 207). Cannon acknowledged receiving a "risk disclosure statement" furnished pursuant to 17 C.F.R. § 1.55. Trial Exhibit 1. No specific information concerning the system or risks associated with it were disclosed to Cannon by Ross. (Tr. at 208–210).[19]

Norman also did not provide Cannon with any special risk disclosure concerning the risks associated with trading the reversal system other than the risk set forth in the risk disclosure statement and Exhibit 39. (Tr. at 712–713). Cannon and Norman did not discuss the Risk Disclosure Statement in detail. (Tr. at 710). Norman believed that Exhibit 39 provided sufficient information about the system for a customer to trade the system. (Tr. at 791). Cannon understood that by trading the system with iron discipline he would eliminate much of the risk described in the Risk Disclosure Statement. (Tr. at 1035–1036). Cannon understood that the system would keep him from losing a lot of money and was less risky and better than trading without a system. (Tr. at 1036).

Cannon was not shown any negative track records about soybeans or any other commodity. (Tr. at 1026–28). Unbeknownst to Cannon, the actual system track record for soybeans reflected cumulative losses as of September 30, 1986. (Tr. at 214; Trial Ex. 7 at Bates No. 001128). The soybean track record reflected a draw-down of approximately $4,700 from June 13, 1986 to September 30, 1986. Cannon was not furnished a copy of this unfavorable track record in connection with opening his account. (Tr. at 215; Tr. at 841–43, 1026–28). This failure to include these negative results with Trial Ex. 39 violated NFA Rule 2–29 as it relates to representations of past results[20]. (Tr. at 1895).

Bradford did not determine what Cannon's risk capital was at the time Cannon's account was opened nor did Bradford undertake any investigation into Cannon's financial background at the time his account was opened. (Tr. at 230–231). At the time Cannon opened his account, he was told that trading in the account would stop if a customer lost 50% of his equity, which was consistent with representations contained in Exhibit 39. Norman also recommended that a customer not risk more than 10% of their net worth trading commodities. (Tr. at 705–707). According to Norman, 10% of a person's net worth was the standard guideline in the industry for acceptable risk capital. (Tr. at 708). According to Ross, no more than 5% of a customer's equity should be put at risk in a single trade. (Tr. at 251–53).

Cannon also executed a limited discretionary trading authorization which allowed Ross and Norman to enter discretionary trades on behalf of Cannon. (Trial Ex. 1). Discretionary authority was required because the system traded intra day, requiring that an order be executed once the market generated a buy or sell signal. Thus, it was not possible for Ross or Norman to call all system customers prior to trading on the system's signal. To properly trade the system, Ross, Norman, or their trading assistant had to place an order each morning, once the opening range was known. (Tr. at 265–266). Ross considered trades placed in that fashion to be discretionary trades. (Tr. at 266).

Ross never told Cannon, however, that changing the size of the contract would violate the principles of the system and never showed Cannon any hypothetical results which reflected the effects of changing the number of contracts traded under the system over a short period of time. (Tr. at 1031–32, 1064, 1079). Ross never advised Cannon that it was improper to incrementally increase the size of his positions in a trending market or

19. At trial, Ross contradicted his deposition testimony and testified that he and Norman disclosed to Cannon what the anticipated draw down was, and the fact that the system would generate day trades. (Tr. at 206). Ross' trial testimony is inconsistent with his own prior testimony, as well as Cannon's testimony (Tr. at 1026–28, 1030,1037), and is not credible.

20. To the extent Ross was acting as a CTA, he would have been required to disclose this information as part of his CTA disclosure document. Trial Ex. 45, p. 22; 17 C.F.R. § 4.31.

that changing the number of contracts traded would adversely affect the system. To the contrary, Cannon understood from Ross that the number of contracts traded had no bearing on the operation of the system. (Tr. at 1148–49, 1151).

## V. FIRST TRADING PERIOD

At the time Cannon opened his account, Norman told him that the account would system-trade commodities other than cotton and bonds as Ross and Norman saw fit and based on market conditions. (Tr. at 716). Within the first nine days, Ross and Norman system-traded Cannon's account in corn, cotton, wheat, soybeans, and treasury bonds. (Tr. 211; Trial Ex. 2 at Bates No. 001889). Although Ex. 39 had suggested that $20,000 equity per contract was required, Ross and Norman never required Cannon to adhere to a $20,000 per contract equity requirement and allowed him to keep minimal equity in his account. (Tr. at 1224–25).

Cannon always relied on Ross and Norman to determine the parameters, commodity, contract month, price, and when to buy or sell. (Tr. at 1038–40). Even though Ross considered the system parameters to be proprietary, Ross contends that he disclosed the parameters to Cannon at some point in time. This disclosure, however, did not affect the trading patterns in the account. (Tr. at 233–34). Cannon testified that he may have been told parameters at one point but that he understood that parameters did not remain constant. (Tr. at 1047).

When Cannon started trading, the number of contracts to trade would be discussed with Ross and Norman and agreed upon by mutual decision. (Tr. at 808–809). In later years, when he lost a lot of money, Cannon and Ross would discuss how many contracts needed to be traded in order to try to make up the losses. (Tr. at 1042).

By early 1987, Cannon's account had lost over 50% of funds invested. Trial Exhibit 56 (Ex. 1). Despite these losses, Cannon was not alarmed because Ross and Norman told him to expect losses and that he needed to plan on trading the system over the long term and take every trade. (Tr. at 1042–43).

In spite of Ross and Norman's back testing and paper trading of the system and Kitchen's tacit approval of its use, Wade recommended that Ross and Norman have the system tested by computer in the spring of 1987. The testing was to be done by John Hill and John Fisher who ran Futures Truth, Inc., a commodity system testing firm located in North Carolina. (Tr. at 716, 1764). In the early spring of 1987, Norman, Wade and Clark went to North Carolina to have the system tested by Futures Truth. (Tr. at 236–37). At the time of the North Carolina testing, Wade understood that Ross and Norman had used the system in their own accounts but was unaware that they had marketed the system to the public. (Tr. at 1770–71). In reality, however, Ross and Norman had been marketing the system and trading it for customers accounts for approximately six months with substantial losses [21] before the North Carolina testing occurred. (Trial Exs. 7, 10, 39; Tr. at 1771–73).

Norman explained the system to John Hill and John Fisher and gave them the parameters to test. (Tr. at 719–22). Most of the time in North Carolina was spent testing the system on bonds. (Tr. at 722–25). Significantly, the testing conducted by Hill and Fisher applied the breakout parameter to the opening price, not the opening range.[22] (Tr. at 237, 726). Wade and Norman testified that results were profitable, but did not recall the exact amounts. (Tr. 729, 1767).

Because the Futures Truth test did not accurately reflect opening range trading or examine many different markets, Ross and Norman bought a computer and hired Joe Dudek to create a computer program which could not only test the parameters of the trading system based on the opening range for a variety of commodities, but also would

---

**21.** Table A to Trial Exhibit 10 reflects composite system results and shows that an initial investment of $1000 in September 1986 was worth only $574 by February of 1987, a loss of 42%.

**22.** This distinction is significant since the price difference between opening price versus opening range could be determinative on how frequently the system trades on a given day, or if it trades at all.

enable Ross and Norman to change the parameters in order to determine the optimal parameter. (Tr. at 108, 717–18, 738–39).

Although they had been using the Merrill Lynch parameter of 4.25 cents for trading soybeans, Norman and Ross assert that they used the Dudek program to test different parameters to see if there was a better parameter which resulted in more profitability, more consistency, less commissions and less draw down. (Tr. at 241–42, 747). The Dudek program also enabled Ross and Norman to test for the approximate effects of slippage by increasing the amount of commissions charged to each trade by $50 to account for slippage. (Tr. at 747–48). Norman was aware that slippage would affect profitability of the system. (Tr. at 749). According to Ross, he and Norman tested parameters ranging from 2 to 30 cents for soybeans, and concluded that 4.25 cents was the best parameter. (Tr. at 239–41). Bradford produced no tests using the Dudek program which substantiated this testimony.

Kitchen, who had direct responsibility for supervising Ross and Norman, did not verify their paper trading, or any of the testing results generated by either Hill and Fisher or the Dudek program. (9/17/97 Kitchen Dep., pp. 25–26, 29). Kitchen testified that, in any event, he did not review any of the results of the 1987 test analytically, but that he might have looked at the results, seen that they were positive, and been satisfied. (9/17/97 Kitchen Dep., pp. 26, 29).

Ross and Norman prepared Exhibit 40— the May 11, 1988 letter—as a promotional tool for marketing the system. Using the Dudek program, Ross and Norman generated a hypothetical track record using a 4.25 parameter for soybeans applied to 1983–84 data. (Trial Exs. 40, 56). The test did not adjust for slippage. (Tr. at 846). According to Norman, 1983–84 was selected to recreate performance during a bull and bear market cycle. (Tr. at 847). The letter also enclosed an actual track record for soybeans beginning in April of 1987. (Trial Ex. 40). The $8\frac{3}{4}$ hypothetical test included a summary of certain selective information but did not include a summary of either (1) the largest draw down in the account, or (2) the large

losses caused by day trades. That information could only be obtained by an extremely knowledgeable customer through analyzing the attached trade-by-trade printout. While Norman agreed that draw down was an important material fact, he stated that he did not feel it was necessary for Bradford to disclose what the draw down was. The May 11, 1988 letter further misleadingly stated that the average trade was $156 and failed to disclose that this figure did not include either commissions or slippage. (Trial Ex. 40 & 56, p. 51). After adjusting for commissions and slippage, the average trade was $53.83 versus the $156 disclosed and net profits were $14,485.54 versus the $27,935.54 disclosed. (Tr. at 858–59; Trial Ex. 40). The effect of this was to overstate the average trade by 190% and the net profit by $13,450, or 92%. (Trial Ex. 56, p. 51). Henricks testified that the May 11, 1988 promotional letter generated by Ross and Norman did not satisfy NFA Rule 2–29 and should have contained a stronger disclaimer. (Henricks Dep., p. 80).

In 1988, when Ross perceived a "bull market" in soybeans, Cannon, based on the recommendation of Ross, increased the size of positions being traded. Although Cannon initially made money while the market was rising, Cannon quickly lost all profits when the market declined, realizing a $94,000 drawdown. (Tr. p. 1055, Exhibit 2; Exhibit 56, p. 38).

During the course of time that Cannon traded, Cannon and Ross developed a social relationship which went beyond a mere broker/customer relationship. Cannon and Ross hunted and fished together on occasion and Ross would attend Christmas parties hosted by Cannon. Ross believed that Cannon relied on Ross' opinions with respect to commodities trading. (Tr. at 247–48).

Bradford's internal policy required that deposits for customers account had to be made with checks which matched the name of the account. Bradford's policy prohibited use of corporate or partnership checks to cover obligations on an individual's account, and vice versa. Copies of all checks deposited were maintained at the local branch office. (Tr. at 614; Trial Ex. 6).

Throughout the life of Cannon's account, Cannon would make margin calls with checks drawn on his real estate escrow accounts at United American Bank and occasionally First Tennessee Bank. Norman and Ross were aware that Cannon was using real estate escrow account checks to make deposits and meet margin calls. On occasion, Ross would even go by Cannon's office to pick up these checks. Although Ross was aware of Bradford's internal policy requiring that all checks be drawn on an account titled consistent with the title of Bradford's account holder, Ross and Norman discussed the fact that Cannon was using escrow checks, as opposed to personal checks, and concluded, without any further investigation, that Cannon had his *own* money in his escrow account. Ross was aware of what a real estate escrow account was but claimed that he did not know which money in the account was Cannon's and which was not.[23] (Tr. at 419–21, 434). Despite the fact that the escrow checks occasionally contained references to property addresses similar to checks used for real estate closings, no one at Bradford ever asked Cannon why he was putting real estate descriptions on checks being given to cover margin calls or to trade in the account. (Tr. at 1053; Trial Ex. 10).

Between 1988 and 1990, Cannon made three deposits to his Bradford account with checks that were returned for insufficient funds. During the period of time after these checks were returned and before they were made good, Bradford continued to execute trades for Cannon's account. Ross never contacted Cannon's bank as a result of these bad checks, but did tell Cannon that he did not need to be bouncing any checks. (Tr. at 404–15).

Between October 1989 and June 1990, Cannon's account suffered a drawdown of approximately $100,000, which eliminated most of the profits which had been previously realized in the account. (Trial Exhibit 56, p. 38). In September of 1990, Cannon told Ross he could not afford to keep trading and quit trading in his commodity account. (Tr. at 246). Cannon told Ross, however, to contact

him when Ross thought that Cannon could make money trading. (Tr. at 1056–57). When Cannon stopped trading in September 1990, he had realized a profit of $12,454, which equates to an annual rate of return of approximately 3.3 percent. (Trial Ex. 56, pp. 38–39). Analysis of the first trading period also reflects average equity of $19,556. Based on a Sharpe Ratio analysis, which compares the rate of return to a riskless return taking into account volatility, Cannon's account should not have been traded because a riskless investment in Treasury Bills would have yielded an equal or better return. (Tr. at 1320; Trial Ex. 56 at 1–1).

## VI. C & F TRADING COMPANY

During the first year that Ross and Norman traded the system, they handled 30–50 customer accounts. (Tr. at 325, 744). In order to market the system to the public, Ross and Norman prepared a marketing brochure for CTAS Partners, a partnership consisting of Ross and Norman, which brochure was reviewed and approved by Bradford management. (Tr. at 330–31; Trial Ex. 8). The brochure represented that the system followed short to intermediate trends, minimized risks, and limited exposure to less than 5% of account equity. (Tr. at 334). Included in the brochure were moving average charts for the soybean and bond market, despite the admission by Ross that the system was not triggered by any calculations based on moving averages. (Tr. at 337). Representations that the system was designed to profit from short to intermediate term trends while limiting exposure in a single trade to less than five percent of the account equity, were misleading and deceptive since nothing in the system determined short to intermediate trends or limits loss per trade. (Tr. at 1350–51).

According to Ross, the system would limit exposure in a single trade to less than 5% of account equity because of the level at which the parameters were set above and below the market in relation to a customer's existing position. (Tr. at 341–42). In prior testimony, however, Ross was unable to explain why

---

**23.** This conclusion was inconsistent with Ross' understanding that a principal could not co-mingle his personal funds in with an escrow account. (Tr. at 433).

the system should limit exposure on a single trade. (Tr. at 342). In reality, there is no aspect in the design of the system itself which would limit losses in a single trade to 5% of account equity. Further, Ross admitted that 100% of account equity could be lost in a single trade. (Tr. at 342–43). Despite Ross' testimony to the contrary, Ross never limited the size of any customer's trade in order to limit potential losses to 5% of equity in a single trade. (Tr. at 345–46).

Although Ross and Norman had been dispensing trading advice with the system since June of 1986, Ross and Norman formed C & F Trading Company ("C & F"), which was registered as a CTA with the CFTC in August of 1989. C & F used the system in trading customers accounts, but managed customers accounts based on a reduced commission combined with a share of the customer's profits, if any. (Tr. at 346–47; Trial Ex. 9). As a CTA, C & F filed disclosure documents with the CFTC which were used to solicit customers. (Trial Ex. 9).

C & F's CTA disclosure statements were misleading and deceptive in that: (a) they falsely represented system trading began in September 1986, when it had actually started in June 1986,(b) they did not include all actual trade results in the composite performance result (Tr. at 349–50; Trial Ex. 9); (c) the composite performance results would not enable an investor to determine whether the system worked successfully in a particular commodity[24] (Tr. at 351–52); and (d) they falsely represented that Ross and Norman traded their own personal accounts exclusively on the system, when, in fact, they did not. (Tr. at 353, 743–44, 1352–54; Trial Exs. 9, p. 6, Trial Ex. 42).

Although Cannon never became a C & F customer, Cannon was provided with copies of C & F disclosure documents, which formed a part of the mix of information available to him about the system. (Tr. at 364). Cannon, already on the system at Bradford, saw no reason to share profits with Ross and Norman and, as a result, never became a C & F customer. (Tr. at 1085). C & F proved unsuccessful, and Ross and Norman abandoned its and their own CTA registrations in 1992. (Tr. at 366). Although Ross failed to register as a CTA between March 1992 and February 1994, there was no substantive difference between Ross' use of the system in Cannon's account when he was a CTA versus when he was not a CTA. (Trial Exs. 2, 7, & 9).

On December 1, 1989, C & F and Bradford entered into agreements with Hurley and Associates, an introducing broker, whereby C & F, as a CTA, furnished trading advice through the system, to Hurleys' customers. (Trial Ex. 55). Hurley paid a front-end fee of $65,000 to Bradford and C & F in order to receive the system trading advice from C & F. (Tr. at 1238). It is significant that C & F, rather than simply Bradford, entered into the agreement to provide the system trading to Hurleys' customers. The reasonable inference is that Bradford considered the system trading activities of Ross and Norman to be separate and apart from their ordinary duties as brokers employed by Bradford. Had Bradford perceived that Ross' and Norman's system trading activities were solely incidental to their duties as Bradford brokers, it would have been unnecessary for C & F to be the contracting party with Hurley. Further, the payment of a lump sum of $65,-000, not as commission, but as a front end fee, was clearly outside of the normal type payment a broker would receive incidental to his ordinary duties.

## VII. SECOND TRADING PERIOD

Ross solicited Cannon to resume trading in approximately March of 1992. Ross told Cannon that there were opportunities to make money both by trading the system and

---

**24.** The composite performance tables reflected system performance for all commodities traded and did not reflect how any individual account fared. The tables did not reflect the amount of draw downs to an individual account, whether individual accounts reflected in the composite performance tables were active during trading periods, whether individual accounts in the composite performance tables were more active than others, or what commodities were traded within the individual accounts within the composite performance tables. (Leslie Dep., pp. 75, 85–88). Since performance differed materially depending on the commodity, use of the composite was misleading. See 17 C.F.R. § 4.35(a)(3)(i), (ii); Trial Ex. 7.

by trading cotton spreads, which had lower margin requirements. (Tr. at 247–250). Ross advised Cannon that there was a potential for a bull market and encouraged Cannon to resume trading soybeans on the system. Cannon did not know what a cotton spread was but understood that it was less risky because the margin requirements were less. (Tr. at 254–256, 1058–1059). Cannon believed that the system had been refined and improved by Ross and relied on representations to this effect from Ross to resume trading. (Tr. at 1087).

Ross' representations in 1992 that the system had been improved and that there were new opportunities in the market was integral to Cannon's decision to resume commodity trading. (Tr. at 1089–90). Cannon believed that the hypothetical test results were the result of testing by Bradford and relied upon his belief that the system had been properly tested as a reason to trade the system. (Tr. at 1088). Ross never told Cannon that Ross was a mediocre trader in his own account despite the fact that such a disclosure would have been relevant to Cannon in determining whether to follow Ross' trading recommendations. (Tr. at 1088).

When Cannon resumed trading in 1992, Ross did not provide Cannon with any updated track records reflecting the performance of the system. (Tr. at 257). By 1992, Ross and Norman had discontinued using the system in virtually all commodities except for soybeans. (Tr. at 862). By the time Norman left Bradford in November 1992, only ten to fifteen accounts were still being traded on the system. (Tr. at 744, 1359; Trial Exs. 7, 56 at 59). Instead of telling Cannon that the system did not work and that it had failed in numerous markets, Ross represented that the system was improved. (Tr. at 485–86, 1087).

When Cannon resumed trading in 1992, his investment objective was "to make a lot of money" and he told Ross that he needed to make at least a $1,000,000. (Tr. at 1059). As Cannon's trading progressed, Ross became aware that Cannon needed to make a lot of money. (Tr. at 507).

After Cannon resumed trading in 1992, Ross continued to trade on a discretionary basis and to suggest all of Cannon's trades. Ross determined which commodity, contract month, price, and the time that the trade should be made. (Tr. at 254–56, 283–87). Between 1992 and 1994, Cannon's account traded in approximately thirty different markets. (Tr. at 1066; Trial Ex. 56, Ex. 7–1). Cannon followed all of Ross' recommendations, whether system trades, spreads, or non-system trades. As far as Cannon understood, virtually every trade except spreads was traded on the basis of the system. (Tr. at 1050, 1075–76). As far as Cannon knew, Cannon took every trade which the system called for. (Tr. at 1086).

Cannon spoke regularly with Ross concerning the account, although the frequency of the contacts varied from every several days, if account activity was slow, to several times per day if trading was frequent. Similarly, if day trading occurred, Cannon would talk to Ross since Cannon needed to know how much money he needed to meet his margin calls. (Tr. at 1045–46). Cannon relied on Ross and Norman to provide him with information about his account and how the market was doing. Cannon did not monitor commodity markets independently of Ross and Norman. (Tr. at 1048–49, 1272). Ross was aware that Cannon maintained a busy real estate practice and did not have time to spend his days watching the commodity market. (Tr. 289–90). Over the life of the account, there were times where Cannon was concerned about whether the system worked and he would discuss this with Ross. Ross would discuss fundamental factors which impacted the markets, and would tell Cannon that efforts were being made to improve the system, such as ways to improve fills or decrease the number of day trades. At no time, however, was Cannon told that the system simply did not work. (Tr. at 1044–47).

In September of 1992, Cannon experienced a large loss of approximately $110,000 trading spreads. While Cannon never told Ross that the escrow checks used to cover losses were really client funds, Cannon did indicate to Ross that Cannon was borrowing money to trade which he needed to pay back. (Tr. at 1080). Cannon discussed the losses with

Ross but Ross did not advise Cannon to quit trading or that the system did not work. (Tr. at 1061).

In the spring of 1993, Ross perceived another bull market in soybeans. He and Cannon discussed and decided that Cannon should increase the size of his positions earlier than in 1988, in order to capitalize on the bull market. Ross encouraged Cannon to start big rather than to increase the size of the positions a little at a time while the market climbed. (Tr. at 487–88; 1064). According to Ross, the decision to increase the number of positions was jointly made by Ross and Cannon. (Tr. at 512). Cannon relied upon Ross' advice as to whether a bull market was developing or declining in determining the number of contracts to trade. (Tr. at 1054, 1068–69).

By May of 1993, Cannon had cumulative losses of $232,000 in his account. When Cannon would discuss the losses, Ross would always have explanations as to why the losses occurred, leading Cannon to believe that if he continued trading the system would eventually work and losses would be recouped. (Tr. at 1195–96). This philosophy was reflected in a sign posted in Ross' office which stated, in effect, that if you did not place a bet everyday, you could be walking around lucky and not know it. (Tr. at 1084–85).

During the summer of 1993, Ross loaned $10,000 to one of Cannon's companies, National Homes, Inc., which was in the business of buying, renovating, and reselling HUD homes. (Tr. at 499–500). National Homes executed a note which paid interest of $2,000 for the use of $10,000 for two months, which amounts to an annualized interest rate of 120%. (Trial Ex. 24). Ross testified that he did not find this interest rate to be suspicious or usurious and that he thought that Cannon was simply passing on a "good deal". (Tr. at 590–91).

In the summer of 1993, when Ross convinced him that a bull market was about to materialize, Cannon discussed with Ross the alternative of simply taking a long position while the market trended upward. Ross persuaded Cannon, however, that the market did not simply go up in a straight line and that the reversal system would be able to profit off of market fluctuations while the market trended upwards over time. Cannon believed, based on Ross' representation, that this strategy would allow him to make money "coming and going". (Tr. at 1067, 1118–19). Ross told Cannon that trading the system was better than simply going long since it caught trades both ways. Ross told Cannon that if making money by simply being long was that easy, everyone would do it. (Tr. at 1067–68).[25]

By late August 1993, Cannon's account was trading as much as one million bushels of beans. (Tr. at 1328; Trial Ex. 5)[26]. During the month of August, Cannon sustained losses of $307,296 and a year to date loss of $203,218. (Trial Ex. 56 at 7–1). Cannon discussed the losses with Ross and was told that if they could lose the money, they could also make the money back up by continued trading. Cannon and Ross would discuss how many contracts Cannon needed to trade in order to try to make back the losses. Ross never told Cannon to quit trading but did express concern that Cannon be able to satisfy his margin calls and not leave Ross "holding the bag". Ross, however, never told Cannon that the trading being done did not follow the system. (Tr. at 1065–1066).

Cannon's account showed a loss in September 1993 of approximately $243,069 and a year to date loss of $446,287. (Trial Ex. 56 at 7–1). Cannon's account experienced a profit in October 1993 of approximately $58,469 but still had a year to date loss of $387,818. (Trial Ex. 56 at 7–1). Cannon's account suffered losses for November 1993 of $380,927

---

**25.** At trial, Ross testified that Cannon, from time to time would question he would be better off simply taking a position and go long and Ross would question him as to how to determine when to take profits or stop losses as the market moved if the account was traded in that fashion. In prior testimony, however, Ross testified that Cannon was opposed to simply going long and taking a position and preferred to trade the reversal system. (Tr. at 481–82).

**26.** Ross has never had another client trade 1,000,000 bushels of beans at a time. (Tr. at 438).

with a year to date loss of $768,745. (Trial Ex. 56 at 7–1).

When Cannon would incur losses in the account, Ross would remind him that traders who sustained losses and stay in the market for the long haul are the ones who are in the market to catch big market movements when they occur. (Tr. at 1062). After Cannon suffered substantial losses, he continued to trade based on Ross' continued representations that Cannon had to stay in the market in order to make back the money that was lost. (Tr. at 1065). Cannon continued to believe, based on Ross' representations, that the system would make money whether the market was going up or down and that if you stuck with the system over time, it would produce big profits. While Cannon understood he could lose money, he always understood that the system would limit his losses. When Cannon's account was solicited, he understood that, in a worst case scenario, he might lose fifty percent of his account. (Tr. at 1117–18). Although Ross repeatedly told Cannon that the system was being refined through additional testing, Cannon never understood how the testing was done or how the refinements were determined. (Tr. at 1078). Cannon never understood that, under the system, "every day was a new day" in that the trading decision made by the system on any given day bore no relationship to any prior historical market activity. Cannon relied on the representations of Ross and Norman for his belief that the system should work. (Tr. at 1078–79). Ross admitted that it would be difficult for Cannon to know whether or not the system was really working. (Tr. at 473–74).

Cannon's account was the largest commodities account handled by Ross. A substantial part of Ross' income was derived from commissions charged on Cannon's account. (Tr. at 435–37). While Cannon's trading losses mounted during the fall of 1993, Bradford and Ross continued to earn substantial commissions. (Leslie Dep. at pp. 113–115; Trial Ex. 56, at Ex. 7–1). As of November 30, 1993, year-to-date commissions charged to Cannon's account totaled $212,000. (Trial Ex. 56 at 7–1). From time to time, Cannon and Ross would discuss commissions, and Cannon occasionally asked Ross to reduce his commissions. According to Cannon, Ross did not like to talk about commissions. Cannon did not keep track of the commissions he was paying through his confirmations since he talked to Ross regularly and his account position could change dramatically by the time confirmations were received in the mail. (Tr. at 1077).

During the same period of time, Cannon's account had a very high commission to equity ratio. (Leslie Dep., pp. 114–115, Trial Ex. 56 at 7–1). Cannon's commission to equity ratio, *i.e.*, the amount of return on equity required simply to pay for commissions, was 254% in 1992, 424% in 1993 and 93% for the first two months of 1994. On a monthly basis during this time, the commission to equity ratio regularly exceeded 18%. (Trial Ex. 56 at 7–1).

Ross initially testified that if he was trading soybeans on the system for Cannon, then he would not trade against the system at the same time. (Tr. at 283–87). Ross could not identify any trades called for by the system which Cannon did not take from March 1992 until Cannon's account was closed. (Tr. at 476–77). Although Ross sold the system to Cannon and other customers on a basis that the system was a superior approach to trading commodities, proof indicated that on numerous occasions Ross would enter trades which were contrary to the express dictates of the system. (Tr. at 453–72; 1381–84; Trial Ex. 56 at 11–1). When confronted with examples of trading contrary to the system, Ross changed his testimony and admitted that at times he traded against the system and that he would have made these recommendations to Cannon. (Tr. at 471–72). Cannon, however, was never aware that Ross was trading against the system. (Tr. at 1086). The initiation of trades contrary to the trades called for by the system, accompanied by Ross' failure to follow the system in his own accounts, demonstrate that Ross had no confidence in the system even though he urged his customers to follow the system and take every trade. None of the promotional literature or track records maintained by Bradford show the effects of trading contrary to the system while at the same time

placing system trades. *See* Trial Exhibits 7, 8, 9, 39, 40.

Although Cannon believed that his account was being traded on a reversal system, Ross testified that sometimes he would not place reversal trades for customers on the system but would cause a customer's account to go "flat" in the market, *i.e.,* taking only long or short signals and exiting the market when a contrary signal was indicated. A customer's account might be traded on a reversal basis for a period of time, on a flat basis for a period of time and then revert back to a reversal basis. (Tr. at 628). This strategy was based on Ross' perception of market fundamentals. Ross did not point out any specific trades made by Cannon using this approach. The track records maintained by Russell would not reflect the consequences of a customer's switching from a reversal system to a system which went flat and vice versa. (Tr. at 632; Trial Ex. 7). Similarly, none of the promotional literature or hypothetical tests relating to the system, or the C & F disclosure documents, suggested that a system account may or may not reverse its position based on Ross or Norman's determination. (Trial Exs. 8, 9, 39, 40). Ross' direction that the system go "flat" evidences Ross' control over the account and Cannon's reliance upon Ross' judgment concerning the market. It is significant that Ross would allow certain of his customers to go "flat" based on fundamental factors when the reversal system was marketed on the assumption that the technical trading system would perform well over time *without regard to fundamental factors.*

Bradford's written internal policy requires that all margin calls in excess of $20,000 be made by wire transfer or cashiers check. (Trial Ex. 6; Tr. at 368; 6/21/96 Kitchen Dep., p. 56). Cannon routinely made margin payments in excess of $20,000 without complying with this requirement. (6/21/96 Kitchen Dep., p. 58). Cannon would either bring the check over to Bradford's office or, on occasions, Bradford employees, and sometimes Ross personally, would go to Cannon's office to obtain a margin call check. (Tr. at 368–70). Despite instances when Cannon wrote bad checks or failed to timely honor margin calls, Bradford never sought to verify Cannon's financial condition or forced him to adhere to its policy. (Tr. at 417–18).

Ross testified that Cannon met his margin calls in most cases on the first or second day after the margin call was made. (Tr. at 372). When confronted with several instances of Cannon being allowed to place trades despite failing to meet his margin calls on the first or second day, Ross admitted that he allowed Cannon to continue to trade and place new positions while the account was on a margin call. (Tr. at 373; Trial Ex. 5). Ross argued, however, it would only make a difference if Cannon's account had carried a deficit balance while trades were allowed.

The relevant Exchange rules prohibit an FCM from placing new trades for a customer while that customer's account is on margin call. Bradford's internal rules prohibit placing new trades when a margin call is more than four days old. (Trial Ex. 6; Tr. at 397–98, 2096–97, 2099).[27]

Despite these two rules and the fact that Cannon's account had sustained large losses, Ross continued to place sizeable system trades in Cannon's account while the account was under margined.[28] or on debit balance. (Tr. at 377–95; Trial Ex. 5). Allowing new trades to be placed in Cannon's account while the account was under margined and/or in a deficit equity balance, was a knowing violation of exchange rules, as well as Bradford's internal policies. (Tr. at 395, 397–98,2096–97, 2099; Trial Ex. 6).

After Cannon had sustained heavy losses in late 1993, Kitchen requested that Ross send a copy of one of Cannon's real estate escrow checks to Kitchen following a large margin call. Kitchen wanted to see the check to see "how deep" Cannon's pockets

---

27. Allowing a customer to put on new positions while subject to unmet margin calls creates risk for the broker in the event of a customer's default. (Tr. at 375–76).

28. Russell was aware at the time of trading whether a customer had an outstanding margin call. The fact that a margin call was outstanding, however, did not prevent continued trading in a customer's account. (Tr. at 625).

were.[29] (Tr. at 423–24, 2058,2068; 6/21/96 Kitchen Dep., p. 58). Ross told Kitchen that all of Cannon's margin calls were met from checks drawn on Cannon's real estate escrow account. (6/21/96 Kitchen Dep., p. 60). Kitchen understood the nature of a real estate escrow account and that client monies passed through the real estate escrow account. (6/21/96 Kitchen Dep., p. 62). Kitchen was concerned about the source of the funds Cannon was using to meet his margin calls and requested that Ross obtain a letter from Cannon stating that the funds belonged to Cannon. (6/21/96 Kitchen Dep., pp. 62–63; Tr. 2066). As Ross and Norman had previously concluded, Ross and Kitchen decided that a lawyer's real estate escrow account would contain money belonging to the lawyer as well as to clients.[30] Neither Ross nor Kitchen, however, took any meaningful steps to verify this belief or to determine whether client funds were being used to cover Cannon's trading losses. (Tr. at 428; 6/21/96 Kitchen Dep., p. 60). Despite Kitchen's request, Cannon never provided Ross with a letter stating that Cannon owned the funds in the escrow account, although Cannon told Ross that the funds were his. (Tr. at 429; 6/21/96 Kitchen Dep., pp. 60–61). No verification was sought by Bradford from Cannon's bank to verify that the funds in the escrow account were Cannon's own. (6/21/96 Kitchen Dep., p. 63).

Although at trial Ross denied that the system generated excessive day trades, Ross had admitted in prior testimony that day trades were a problem with the system which Ross unsuccessfully tried to eliminate. (Tr. at 477–79). According to Ross, he disclosed to Cannon and other customers: (1) that the system would generate day trades that always created losses, (2) that the system would generate greater commissions than would be generated by merely taking a position and holding it, and (3) that system might not work as well for multiple contracts as it would for a single contract. (Tr. at 245–246).

These material facts, however, do not appear in any of the written materials generated by Ross and Norman to sell the system to customers. (Trial Exs. 7, 8, 9, 39 & 40). Ross' trial testimony on this issue is not credible and it is more reasonable to infer that Ross never made such disclosures.

Ross testified that he discussed day trades with Cannon and would run different parameters on the Dudek program in order to demonstrate to Cannon that trading at a 4.25 cent parameter on soybeans was best. Ross testified that a higher parameter than 4.25 cents would generate greater draw down. (Tr. at 517–19). Ross could only have arrived at this conclusion by failing to include slippage in his test. It is uncontroverted that when slippage is taken into account, it is clear that 4.25 cents was not the best parameter. A parameter of 8.8 cents would have generated more profits, less commissions and less draw down in Cannon's account. (Tr. at 1286–91; Trial Ex. 56, pp. 28–29).

Between March of 1992 and the closing of Cannon's account in February of 1994, Cannon's account suffered gross trading losses (*i.e.,* the sum total of all losing trades) of $2,361,736 and net trading losses (*i.e.,* the sum of all losing trades ($2,361,736) less the sum of all profitable trades ($1,315,247)) of $1,046,490. (Tr. at 1321; Trial Ex. 56, p. 72, Exs. 2–1, and 9–1).

## VIII. ORDER TICKETS

Trial Exhibit 3 consists of order tickets for trades executed in Cannon's account between 1990 and 1994. While all trades were solicited by Ross, 91% of the tickets are marked "discretion exercised", 3% are marked "Discretion not exercised" and 6% are not marked. (Trial Exhibit 56, Ex. 8–1). The tickets are all either filled out by Russell, Ross or Norman. Branch manager initials also appear either by Willis, Hart Dillard (who succeeded Willis), or Ross confirming

---

**29.** An inference can be drawn from this that Kitchen actually became concerned that Bradford was accepting escrow checks, rather than to see "how deep" Cannon's pockets were, since there is nothing in the way of financial information to be gleaned from the check, itself, *other than the source of funds.*

**30.** Even if this notion were true, Bradford offered no proof to justify a good faith belief upon which to accept escrow checks which, in the aggregate, far exceeded Cannon's stated annual income. See Trial Exhibits 10 and 12.

the orders were correctly entered at the time. Many of the tickets which are marked "discretion not exercised" are virtually identical to trades which are marked "discretion exercised". (Tr. at 307–308). Other order tickets are block order tickets where there is no designation as to whether discretion was exercised. Nevertheless, Ross testified that block order tickets for spreads would have been discretionary trades. (Tr. at 311). Some order tickets for block trades were marked non-discretionary when they should have been marked discretionary. (Tr. at 317). Between 1992 and 1994, many of the system trade order tickets were completed by Russell, who would indicate whether or not discretion was being exercised with the trade. Ross, who was branch manager during 1992–94 never complained of Russell incorrectly indicating whether discretion was exercised on a ticket. (Tr. at 625).

Russell frequently would fill out order tickets for system trades, such as soybeans and corn, once the opening range was known each morning. (Tr. at 616–18). Russell, who was given the parameter for each market, placed a block stop order for all system customers and, if an order was filled during the course of the day, would immediately place a stop order in the reverse direction in order to reverse the system if the price crossed the opposite parameter. (Tr. at 620). Russell traded the same number of contracts for each customer each day until advised by the Ross or Norman as to a change in the number of contracts. The system parameters between 1992 and 1994 remained fairly constant; 4.25 was the only parameter used for soybeans during that period. (Tr. at 622).

It is Bradford's policy that block orders may contain either discretionary orders or non-discretionary orders, but not both. (Henricks Dep., pp. 86–87; Exhibit 6). Bradford's compliance department considers a broker to be making a trade pursuant to the broker's discretionary authority if the box on the order tickets is marked "discretion exercised". (Henricks Dep., p. 82). It is reasonable to infer that if any order ticket for Cannon's account was marked "discretion exercised", then discretionary authority was being exercised by Ross.

## IX.   SUPERVISION OF ROSS

Bradford is required to conduct its futures transactions in accordance with rules promulgated by the NFA, CFTC and other applicable laws and regulations. (9/17/97 Kitchen Dep., p. 22). Accordingly, Bradford has a duty to diligently supervise [31] its brokers and adopt and enforce a written supervisory procedure. (17 C.F.R. § 166.3; NFA Rules 2–8, 2–9; Henricks Dep., pp. 15–16; 9/17/97 Kitchen Dep., pp. 43–44). This duty is heightened with respect to brokers who control discretionary accounts.[32] (NFA Rule 2–8(c); Henricks Dep., p. 17). Discretionary accounts must be diligently supervised on a daily basis to see that trading in the account is not excessive in size or frequency in relation to the financial resources in that account. (Trial Ex. 46), CBOT Rule 423.03. The exercise of discretion by a broker handling a customer's account creates a fiduciary duty owed by the broker to the customer and a rebuttable presumption of the broker's control over the account. (9/17/97 Kitchen Dep., p. 45, Tr. at 1813). As a result, Bradford's compliance department monitors trading "to ensure that inappropriate trading strategies are not being employed by a broker on a discretionary account". (Henricks Dep., p. 18).

Bradford also had a duty to insure that all promotional materials, including hypothetical results, were not misleading. (Tr. at 1398–1402; Trial Exs. 59, 60; NFA Rule 2–29). Bradford was required to be able to demonstrate the basis for any hypothetical results

---

**31.** Kitchen testified that the term to "diligently supervise" implied that one actively and adequately supervised ones employees in the activities of one's business. (9/17/97 Kitchen Dep., p. 42).

**32.** Kitchen testified at his deposition that a Bradford account executive engaged in discretionary trading with a technical system does not have the same duties to provide Bradford with information about his system as would an outside CTA. (6/21/96 Kitchen Dep., pp. 40–41). At trial, however, Kitchen denied that Bradford requires any heightened supervision of a CTA. Tr. p. 2034.

and the underlying theory of the system which generated the results. (Trial Ex. 44, p. 48, NFA Rule 2–29). Bradford had a duty to determine initially whether or not the system was likely to generate excessive trading and a continuing duty to supervise under NFA Rule 2–9. (Henricks Dep., pp. 76–77). Bradford breached this duty by failing to undertake any analysis or testing to establish the basis of the system and, instead, relying upon the inadequate testing and representations of Ross and Norman.

Bradford had a duty to monitor commission equity ratios to detect possible excessive trading. (NFA Rule 2–9). It was the policy of Bradford's compliance department to send commodity account inquiry forms to all brokers or branch office managers whose discretionary accounts had year-to-date net losses of $15,000.00 or more. (Henricks Dep., pp. 25–26). Nellie Roberts, who sent out these forms, also issued monthly reports to Henricks and Kitchen on discretionary accounts with year-to-date net losses of $15,000.00 or more and monthly commission-to-equity ratios of 18% or higher. (Roberts Dep., pp. 9–12, 20, 24, 27, 31, 38 & 40). When a discretionary account is experiencing large losses and high commission-to-equity ratios, one of Bradford's concerns is to investigate whether the broker is trading the account excessively. (Leslie Dep., p. 31). The benchmark of 18% per month is set to identify possible excessive trading of discretionary accounts. (Henricks Dep., p. 47). The reports also assessed the impact of year-to-date net losses on customers' financial condition. (Roberts Dep., pp. 31, 54–55; Trial Exs. 12, 13). The reports served to trigger further investigation of broker's trading philosophies and customer investment agendas. (Henricks Dep., pp. 19–23).

Roberts compiled her monthly reports based on the broker responses to the account inquiry forms. (Henricks Dep., p. 26). Henricks generally relied on Roberts to determine whether or not the losses suffered in the reviewed accounts during the reported period were substantial enough to affect the financial condition of the customers who owned those accounts. (Henricks Dep., p. 27). Bradford, however, did not have any guidelines to assist Roberts in her determination as to the materiality of account losses. (Henricks Dep., p. 27; Roberts Dep., pp. 71–72).

In Roberts' experience and opinion, an account with a commission-to-equity ratio of 200% per annum would be excessive, without regard to the size of the account. (Roberts Dep., p. 118). A high commission-to-equity ratio in a discretionary account with a pattern of losses would warrant further investigation of the account. (Roberts Dep., p. 118). Ray Clark, an assistant to Kitchen, stated that a commission-to-equity ratio of 40% per month would be "huge". (Clark Dep., p. 38).

In August 1990, Roberts issued a commodity account inquiry as a result of year to date net losses in Cannon's account of $53,505. (Trial Ex. 12). Norman, who responded to the inquiry, relied upon the financial data provided by Cannon in October 1986. Norman indicated to Roberts that he and Ross made all the investment decisions on Cannon's account and that they did not contact Cannon before executing all trades because it was a managed account. (Trial Ex. 12).

From approximately July 1992 through February 1994, Cannon's account always had either year to date losses in excess of $15,000, or a commission to equity ratio of 18% or greater, and generally suffered from both. (Trial Ex. 56 at ex. 7–1). During this period, Roberts only sent out two commodity account inquiry forms to Ross, which were a result of Cannon's losses through October and December of 1992. (Trial Ex. 12; Roberts Dep., pp. 88–91). Ross completed each form based on updated financial information he obtained from Cannon over the telephone. Although Ross believed that Cannon understated his income,[33] he continued to trade Cannon's account even though he understood that Cannon was misrepresenting his financial picture. (Tr. at 581–83; Roberts Dep., pp. 53–54). By the end of December 1992, Cannon's account reflected year-to-date commissions of $31,415.00, and a year-to-date net loss of $163,024. (Roberts Dep., p. 56; Trial

---

**33.** This belief was not consistent with Ross' knowledge that Cannon sold his house and had liquidated his interest in the Cow Island Hunting Club. (Tr. at 1080–81).

Ex. 12). The response to the January 30, 1993 inquiry showed Cannon's estimated net worth as $1,200,000, his estimated liquid assets were valued at $250,000, and his estimated annual income was $250,000. (Roberts Dep., p. 57; Trial Ex. 12). Despite Cannon's loss of 65% of his liquid assets, Roberts' report to Henricks concluded that Cannon's year-to-date net losses would not substantially impact his financial condition. (Roberts Dep., pp. 54–55; Trial Ex. 13). Roberts did not independently verify the information contained in Ross' response to the inquiry on Cannon's account. (Roberts Dep., pp. 65–66). According to Henricks, a one-year net loss of $163,000 in the account of a customer whose net worth was $1,200,000 and whose estimated annual income was $250,000 would warrant further review. (Henricks Dep., pp. 35–36).

Between January 1993 and the closing of Cannon's account, Roberts did nothing to notify her superiors that Cannon's commission-to-equity ratio generally exceeded Bradford's 18% per month and that losses exceeded $15,000, because she understood that Henricks and Kitchen were very familiar with the account.[34] (Roberts Dep., pp. 60–65). Roberts stated that she was told by Kitchen or Manning that it was not necessary to issue account inquiry forms on Cannon's account despite his large losses because Cannon was financially sound.[35] (Roberts Dep., pp. 92–93).

Leslie, Bradford's operations manager, characterized, Cannon's losses from August through November 1993 as "dramatic" and the commission-to-equity ratio as "fairly high" and recalled discussing Cannon's losses at the time (Leslie Dep., pp. 116–117). Kitchen considered Cannon's commission to equity ratios worthy of further investigation during the 1992–1994 trading period. (6/21/96 Kitchen Dep., p. 53).

On February 1, 1994, Cannon's account appeared on Roberts monthly report of accounts with net losses in excess of $15,000.00, for the year ending December 31, 1993. (Roberts Dep., pp. 82–83; Dep. Ex. 2). Cannon's account experienced net losses of approximately $792,000 in 1993. (Roberts Dep., p. 84). Roberts' report concluded that the losses suffered by Cannon were not substantial enough to affect his financial condition. (Roberts Dep., pp. 82–84). Roberts stated that a net loss of $792,000 would be substantial in relation to an account for a person whose net income was $250,000 per year. (Roberts Dep., p. 84). It is reasonable to conclude that Robert's repeated assessments that Cannon's losses were not substantial enough to affect his financial condition were totally lacking any factual foundation.

Although Bradford contends that Cannon's trading of very large positions was non-discretionary, Ross never sought to terminate his discretionary authority over Cannon's account. (Tr. at 489). Henricks testified that, if a broker began to place only non-discretionary trades in a discretionary account, it would be reasonable to infer that, a written revocation of discretionary authority or confirmation of an oral revocation should be evident in Bradford's records. (Henricks Dep., pp. 84–86).

No one at Bradford attempted to contact any banking reference or other reference to determine whether or not Cannon had the financial wherewithal to meet the losses that were being sustained in his account.[36] (6/21/96 Kitchen Dep., pp. 51–52).

NFA Rule 2–8(b) required Bradford to adopt and enforce written procedures to in-

34. Henricks, who would normally expect an inquiry to be sent on an account with year-to-date net losses in excess of $400,000, did not know why Roberts ceased sending inquiry forms to Ross on Cannon's account. (Henricks Dep., pp. 56–57).

35. Ross and Henricks both denied that they ever told Nellie Roberts that it was not necessary to send account inquiry forms on Cannon because he was financially sound. (Tr. at 486–87; Henricks Dep., p. 56).

36. Though Kitchen testified that it was not Bradford's policy to verify a customer's financial condition, Paragraph 15 of Cannon's customer agreement authorized Bradford to contact Cannon's bank to verify the accuracy of his account information and to that no one other than Cannon had an interest in the account. See Trial Exhibit 1.

sure regular review of discretionary trades by someone other than the person exercising the trading authority and a written record of the review. Bradford's compliance manual required that all branch managers review order tickets of discretionary accounts on a daily basis and to review equity runs for margin status, the nature of trading, and commission to equity ratio. (Trial Exhibit 6, pp. 3–2, 15–1). During the time that Ross was branch manager, Bradford had no policy requiring any daily review of a branch office manager's discretionary account trades. (Henricks Dep., p. 64; Ex. 6; 6/21/96 Kitchen Dep., p. 42). Henricks testified that it was Bradford's policy that discretionary accounts be monitored closely for fear of lawsuits arising from a broker's discretionary trades which were inconsistent with the investment objectives or sophistication of the customer. (Henricks Dep., p. 68).

Prior to Ross becoming branch manager, his order tickets were reviewed by Bud Willis or Hart Dillard (even though Dillard had a limited understanding of commodity trading). (Tr. at 304). After Ross became a branch office manager, there was nobody in the Memphis branch office in a position of supervisory authority over Ross. (9/17/97 Kitchen Dep., pp. 50–51). Bradford did not review Ross' order tickets or supervise his discretionary trading on a daily basis while he was branch manager. (Leslie Dep., pp. 117–118; Tr. at 460–61). Kitchen testified that Ross would be the only person with knowledge of whether or not discretion was exercised on Cannon's trades. (9/17/97 Kitchen Dep., p. 56). While Kitchen reviewed daily equity runs, he did not call brokers on a daily basis

in order to ascertain whether or not their trades were made in the exercise of discretion. (9/17/97 Kitchen Dep., p. 14).

Kitchen testified that from Bradford's Nashville headquarters he was able to supervise the brokers' activities almost daily by reviewing substantially all of the equity runs [37] for all of the customers and all of the brokers.[38] (9/17/97 Kitchen Dep., p. 7). Leslie testified that the equity run for Bradford's futures department is "sizeable". (Leslie Dep., p. 25).

A review of the daily equity runs would not disclose whether Cannon's trades were system or non-system trades, or whether discretion was not exercised, a fact acknowledged by Bradford's expert, Weiner. (9/17/97 Kitchen Dep., pp. 13–14, 56; Tr. at 1811). Although Wade attempted to monitor the system simply by looking at general market movements, the daily equity run did not provide either the opening range or order information and thus did not provide all the information needed to verify whether the system was being followed. (Tr. at 1781–83). At trial, Kitchen contradicted his deposition testimony, as well as Wade, and stated that he could identify system trades from the equity run.[39] (Tr. p. 2036). Kitchen's trial testimony lacks credibility[40]. Even if system accounts were segregated on the equity run, the equity run lacked sufficient information to enable Kitchen to determine whether the system was being followed. (Trial Ex. 5).

Ray Clark, who was also responsible for supervising accounts from 1987–90, testified that the taking of "huge positions" relative to earlier positions, incurring "huge market

---

37. The equity run lists the various trades effected in customer accounts, and certain account information, such as equity balance and margin calls. (Trial Ex. 5; Tr. at 79).

38. While Cannon's account was traded, Bradford employed approximately 20–25 futures brokers in 11 remote branch offices, each branch office with approximately 25–40 commodities trading accounts. (9/17/97 Kitchen Dep., pp. 8–10). The Memphis branch office was one of Bradford's largest commodities offices in trading volume. (Leslie Dep., p. 51).

39. Similarly, there is no way from looking at a monthly statement for a customer to be able to

ascertain whether a trade reflected on the statement was a system trade. (Tr. at 212).

40. As Bradford's partner in charge of the futures department, Kitchen's compensation could be impacted negatively by the plaintiff's claim. (Tr. at 2109). Moreover, Kitchen's lack of credibility is demonstrated by his testimony that a judgment had never been entered against Bradford. Tr. at 2108. On at least one occasion during Kitchen's tenure at the helm of the futures department, Bradford has been held liable to customers for churning. See *Garland v. J.C. Bradford Co.*, 1986 WL 65820, [1986–87 Transfer Binder] Comm. Fut.L.Rep. (CCH) ¶ 22,155 (CFTC 1986). Kitchen's testimony was patently false.

costs" relative to prior costs, experiencing "sudden bursts of activity" not seen before in the account, and "huge" commission-to-equity ratios were indicia of abnormal account activity. (Clark Dep., pp. 37–38). According to Wade, deviations from prior patterns of trading and larger-than-projected drawdowns may be evidence that a system is not working. Bradford, however, never developed any guidelines for monitoring the system in order to determine when it was not working. (Tr. at 1778–1779). According to Wade, he would have been concerned if the system customer was long when market movements indicated he should be short.[41] (Tr. at 1783). Wade would consider it an irregularity for Ross and Norman to be trading against the system without client instruction. (Tr. at 1784–85). Wade felt that Bradford was at risk if the system was marketed to clients and then was not followed. (Tr. at 1786). The proof demonstrates that Ross failed to follow his own system when he placed trades which were contrary to system signals and when he would go "flat" and take only long or short signals.

Henricks testified that the May 11, 1988 promotional letter's representation that the system would perform well if substantial volatility and price increases occurred was an opinion and, as such, required a reasonable basis in fact under Bradford's policy on promotional materials. (Henricks Dep., pp. 93–94). The record reflects that there was no reasonable basis for the representation that the system would perform well in substantial market volatility.

Bradford's compliance policy required that margin calls in excess of $20,000 be made with certified funds or by wire transfer. (Trial Ex. 6). Kitchen was aware that Cannon did not comply with this rule and that the rule was never enforced against Cannon. (6/21/96 Kitchen Dep., p. 58; 9/17/97 Kitchen Dep., pp. 30–31). Ross never asked Kitchen to waive Bradford's requirement (9/17/97 Kitchen Dep., pp. 31–32).

Bradford management in Nashville was aware that Cannon's account was being traded on debit and on margin call. (Tr. at 395). Although Bradford's internal policy required that an AP forfeit commissions and/or lose trading privileges if the AP added new positions for accounts with deficit balances or unmet margin calls over four days old, Ross was never penalized for trading Cannon's account while in a deficit or under margined. (Tr. at 2096–97; Trial Ex. 6).

## X. ROSS ACTED AS A CTA

During the entire time that Cannon's account was traded, Ross exercised trading authority over Cannon's account and advised Cannon with respect to the advisability of commodity trading within the meaning of 17 C.F.R. § 1.3(bb)(1); (Trial Ex. 44, p. 8). This advice related to both trades made under the system, as well as spreads and other nonsystem trades. The giving of advice, directly or indirectly, in managing a trading account or the selling of a trader's system has been held to require CTA registration. See Trial Ex. 44, at p. 8; CFTC v. Filkey, 1997 WL 461992, [1997] Comm. Fut. L. Rep. ¶ 27,172 (N.D.Ill. Aug. 5, 1997). In Filkey, the Commission found:

> Here the defendant, for profit, analyzes the commodities market and sells systems for trading in the commodities market, emphasizing specific profitable trades purportedly recommended by the system, and indicating that following the system virtually assures profitable trading. He is, according to his advertisements, available by telephone for personal consultations. We think those activities are well within the activities Congress intended the CFTC to regulate.

Id. at *1 (citing CFTC v. British Am. Commodity Options Corp., 560 F.2d 135, 141 (2d Cir.1977), cert. denied, 438 U.S. 905, 98 S.Ct. 3123, 57 L.Ed.2d 1147 (1978)); see also In the Matter of R & W Technical Services, Ltd., 1997 WL 742022, at * 11, [1997] Comm. Fut. L. Rep. (CCH), ¶ 27,193 (entity which

---

**41.** Wade's observation suggests that he never really understood that the system had a design flaw which would allow a customer to remain long in a declining market provided the price decline was the result of gap downs or in daily increments which were less than the trading parameter. See Trial Ex. 56, pp. 31–32.

sold computerized trading systems was required to register as CTA).

The record reflects that Ross' development and use of his own proprietary system, and the sale and marketing of the system as an AP, as a partner in CTAS, and as a principal of C & F Trading, was not merely rendering trading advice solely in connection with his employment as an AP. Accordingly, Ross is not exempt from registration by virtue of 17 C.F.R. § 4.14(a)(3)[42]. According to the CFTC:

> [W]here the AP is managing an account pursuant **to his own trading program without the endorsement of the FCM,** the AP's activities would not appear to be 'solely in connection with' his employment. Accordingly, the AP would be required to register as a CTA if he wished to engage in the activities described above. (emphasis added).

CFTC Interpretive Letter No. 94–44 [1992–1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,250 (May 6, 1994). The record shows that Bradford did not approve, disapprove, encourage or discourage brokers to develop systems and did not develop or test the system. See Paragraphs 23–26, *infra.* Ross and Norman developed, tested, and marketed their proprietary system to the public. Although Bradford was aware that Ross was marketing the system and used Bradford stationery to do so, Bradford failed to diligently supervise the investment advice being dispensed with system trading.[43] Ross was, *de facto,* an unsupervised, unregistered, and unregulated CTA at the time Cannon's account was solicited and from March 1992 until Cannon's account was closed. By failing to disclose his lack of registration to Cannon, Ross violated 7 U.S.C. §§ 6b & 6m–6o.

**42.** 17 C.F.R. § 4.14(a)(3) exempts an AP from registration if "the person's commodity trading advice is issued solely in connection with its [the person's] employment as an associated person."

**43.** One of the central reasons for the exemption is the idea that the registered FCM will supervise and control the AP in his CTA activities. *Roth v. SEC,* 22 F.3d 1108, 1994 U.S.App. LEXIS 10605 (D.C.Cir.1994). *See also* CFTC Interpretive Letter No. 94–44 [1992–1994 Transfer Binder]

## XI. CANNON WAS DEFRAUDED

### A. NO REASONABLE BASIS EXISTED FOR ROSS' TRADING

Courts have held that "[i]n recommending a particular transaction or offering a professional opinion, a commodity professional makes an implied representation that there is a reasonable basis for the recommendation or opinion." *Syndicate Sys., Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 1986 WL 68465, at *4, [1986–1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 23,289, at 32,788 (CFTC 1986) (citing *CFTC v. U.S. Metals Depository,* 468 F.Supp. 1149, 1159 n. 40 (S.D.N.Y.1979)); *accord Modlin v. Cane,* 1998 WL 429622, at *8 (CFTC July 30, 1998); *In re Staryk,* 1996 WL 294355, at *8 [1994–1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,701, at 43,926 (CFTC 1996) (broker's representation can be found misleading either because it is false or because no reasonable basis exists to support an assertion that the representation is true); *cf.* 1 Bromberg & Lowenfels, *Securities Fraud & Commodities Fraud* § 4.6 at 82.405–82.406 (1975). This "reasonable basis" representation applies equally in the contexts of creating and promoting technical trading systems. *See In re R & W Technical Servs.,* 1997 WL 742022, at *16 n. 75 (CFTC December 1, 1997); *Leach v. Newport Futures & Options Corp.,* 1994 WL 49274, at *2 (CFTC February 17, 1994).

Both Teweles and Johnson opined that the system had no reasonable basis for trading. (Trial Exs. 56 and 50). Johnson further opined that Ross' nonsystem trading lacked a reasonable basis. Bradford, by contrast, asserts that no reasonable basis was required prior to instituting the system, or, alternatively, that the paper trading and computer testing conducted by Ross gave rise to a reasonable basis for trading the system.

Comm. Fut. L. Rep. (CCH) ¶ 26,250 (May 6, 1994); *see also SEC v. Ridenour,* 913 F.2d 515 (8th Cir.1990) Bradford lacked sufficient information to determine that the system was being followed or whether Ross' trades were System trades ore non-System trades. Bradford never undertook any independent analysis of the system to see why it worked, if it worked, or how to tell if it did not work.

Bradford's expert, Weiner, opined that, so long as Bradford and Ross were possessed of a "good faith" belief that the system would work, then there exists a reasonable basis for the system. (Tr. at 1862). Weiner misstates the law, though, when he testifies that all the broker must show is that he "made a rational determination among available alternatives"—the "pure heart/empty head" defense. (Tr. at 1723, 1863). The CFTC has consistently adopted the following approach:

> In our view, a recommendation has a reasonable basis when the commodity professional has considered those relevant factors that were reasonably ascertainable in the context of the particular recommendation and exercised rational judgment in light of them. For these purposes, it is not necessary that the recommendation at issue be unassailable or even the most preferable of available alternatives. If it is within the range of *acceptable* alternatives, it has a reasonable basis.

*Syndicate Systems*, 1986 WL 68465, at \*4 (emphasis supplied).

The CFTC's long-held position that the "good faith" defense is not applicable and that all available alternatives are not acceptable ones is made absolutely clear in *R & W Technical Services*:

> [S]imply saying it does not make it so. As explained earlier, the record contains absolutely no reliable evidence to support the proposition that the R & W trading systems provided traders with any market advantage whatsoever. *Moreover, even if respondents actually believed that their systems worked (another proposition unsupported by the record), such "a good faith belief [would not be] inconsistent with a finding of scienter." Hammond,* ¶ 24,617 at 36,659 (Specific intent to deceive, as an element of mail fraud and securities violations, could be found from material misstatement of fact made with reckless disregard, and "no amount of honest belief that the enterprise would ultimately make money [could] justify baseless, false or reckless misrepresentations or promises.") (citing *United States v. Boyer,* 694 F.2d 58, 60 (3rd Cir.1982)); *accord Haltmier v. CFTC,* 554 F.2d 556, 562 (2nd

Cir.1977) (intent to injure customer not required); *Do v. Lind–Waldock & Co.,* ¶ 26,516 at 43,322 ("[T]he absence of a specific intent to injure" does not excuse the broker's failure to fulfill a customer's cancellation instruction.).

*R & W Technical Services,* 1997 WL 742022, at \*16 n. 67 (brackets, parentheticals and citations in original; emphasis supplied).

In *R & W Technical Services,* which involved the marketing of a technical trading system, the CFTC stated:

> In contradistinction to the hucksters of retail trading programs, respected scholars are virtually unified in their recognition that even the most legitimate technical systems (with their hypothetical and retroactive foundations) are incapable of providing the trader with any significant market advantage. *Since "[i]n recommending a particular transaction or offering a professional opinion, a commodity professional makes an implied representation that there is a reasonable basis for the recommendation or opinion," this further suggests that any marketer's claim of increased profitability or reduced risk through the use of these systems is likely to be fraudulent.*

*R & W Technical Services,* 1997 WL 742022, at \*16 n. 75 (internal citations omitted; emphasis added).

Ronald Johnson, a CTA and commodities expert, testified for the plaintiff. Johnson was a highly knowledgeable and credible witness. Johnson opined that the system has no logical basis, was improperly tested and was improperly optimized. Johnson also concluded that the system had major design errors in that it generated significant day trade losses and had a fatal flaw in subjecting a trader to unlimited losses in certain markets. (Tr. at 1279–80; Trial Ex. 56, pp. 30–33). The fatal flaw in its design was that the system ignored prior market activity with the result that the system took no corrective action to limit losses if a market gapped up or down from the prior day's closing. (Tr. at 1296–97; Trial Ex. 56 at 31). The same result could be realized if the market made a limit move at the open. (Tr. at 1298–1300; Trial Ex. 56 at 31–32). On at least one

occasion, Cannon lost $119,000 as a result of this system flaw. (Tr. at 1300, Trial Ex. 56 at 32); Dr. Richard J. Teweles, one of plaintiff's commodity experts, also opined that the trading strategy recommended and employed by Ross and Norman for use in Cannon's account were not reasonably based. (Tr. at 924).

The system is premised on the theory that if there is a price breakout at an arbitrary parameter above or below the opening range, this means that the market is going up or down in the same direction as the "breakout" and that the investor should buy or sell accordingly. It was represented to Cannon and the public that the system would let profits run and limit losses while making profits whether the market went up or down. In reality, the system does not recognize a gap up or down in the market and does not recognize whether the market has been trending. (Tr. at 1274–75). Johnson demonstrated that setting a constant parameter above or below the opening range is not predictive of future market movement. Widening or narrowing the parameters merely dictates the frequency with which trades will be placed. In the present case, Ross and Norman selected 4.25 as their parameter for soybeans based on an optimized set of data which had no predictive value when applied to different sets of data. (Tr. at 1281–82; Tr. Ex. 56, pp. 19–28).

Johnson's testimony is consistent with Ray Clark, an assistant to Kitchen who was responsible for supervising Ross in the late 1980's. In Clark's experience and opinion, an opening range break-out system may establish a place to enter the market, but is not predictive of subsequent market moves or long-term momentum. (Clark Dep., pp. 16–17). Aside from hypothetical and actual trading results, Ross could not explain any reason why trading soybeans at 4.25 points

above or below the opening range would be a predictive factor of the future price movements in the commodity markets. (Tr. at 488). According to Dr. Teweles, the opening range breakout system has no intellectual foundation to support the conclusion that a breakout through a fixed parameter from the opening range is predictive of future price movements. (Tr. at 926–930). Teweles testified that a price increase or decrease directly after the opening of the market is not predictive of any future market activity. Teweles further opined that the reversal feature would lead to frequent trading and day trades, and that the system would not be profitable except in an up trending bull market. The system, however, does not indicate whether the market is trending one way or another and does not predict the market. (Tr. at 931–32).[44]

According to Johnson, it is essential in developing a good technical trading system that the system be triggered by the market and that the system developer understand how the system works. This is essential because if it is not known why a system works, it is not possible to know when the system is not working, which can result in large losses[45]. (Tr. at 1262). A good system must also have a positive expectancy curve and loss control. (Tr. at 1262–63). Under a negative expectancy trading system, no possible money management techniques will make the system profitable over the long term. (Tr. at 1264). Reversal systems are generally under-performers, since they are in the market at all times and markets only trend fifteen to twenty percent of the time. Accordingly, approximately eighty percent of the time a reversal system has a high probability of loss. (Trial Ex. 56 at 19).[46] From March of 1992 through February of 1994, the trading results in Cannon's account reflect a

---

44. Teweles testimony is persuasive, particularly in light of Ross' inability to articulate any theoretical reason as to why the system should be predictive of future market movements and Clark's acknowledgment that an opening range breakout, without any other indicators, is simply a market entry device.

45. This importance is underscored in the present case where customers, such as Cannon, were

told to expect weeks or months where losses would occur. Trial Ex. 39.

46. The reversal feature also required discretionary authority in order to execute trades during the day depending on market action. Trading the system in any other manner would invalidate testing results based on the reversal system. (Trial Ex. 56 at 19).

negative expectancy curve. (Tr. at 1265; Trial Ex. 56 at 39).

Although Bradford contends that the testing done by Ross and Norman demonstrated that the system had a reasonable basis, Bradford offered no test results which supported this view.[47] Weiner, Bradford's commodities expert, opined that, (1) Bradford and Ross had no duty to test the system, and (2) Ross had a reasonable basis for trading Cannon's account with the system. (Tr. at 1725, 1866, 1965–66). Weiner conducted no testing of the system. Weiner's testimony contradicts testimony of Henricks, Johnson and Teweles and is inconsistent with Bradford's duty to diligently supervise its broker's discretionary trading, as well as existing case law. Weiner, who opined that a broker could reasonably base a technical trading system on the movement of the planets, was not credible.[48]

Cannon's account was solicited and traded based on express representations that the system would let profits run and limit losses, and that following the system with "iron discipline" would enhance Cannon's chances of success. Neither the manual and computer testing conducted by Ross and Norman, nor the actual system track records provide any reasonable basis for concluding that the system would achieve these expectations. Back testing was wholly inadequate since it failed to account for slippage, intra day trading, or lock limit moves. Similarly, the paper trading and Dudek program testing was conducted in such a manner as to ignore slippage and to maximize the parameters based on a curve fit result which favored commissions over profits, while ignoring the consequences of lock limit market moves.

Two to three months of actual trading period was an insufficient time for Ross to form a reasonable belief that the system would be profitable over the long term. (Tr. at 1424). Moreover, by 1992, any prior paper trading and computer testing would not have provided a rational basis for system trading in light of the wholesale failure of the system in other markets, a conclusion which is reinforced by Ross' recommendations of spreads and other nonsystem trades, trading against the system, and failure to follow the system in his own trading. Continuing to solicit customers to utilize the system given its dismal performance over a period of years when Ross and Norman made no money using it themselves was a fraud. Even if the Court assumed that Ross and Norman had a "good heart" and believed in their system, such a belief would be a reckless disregard for the truth. (Trial Ex. 50, p. 3).

It is difficult to conclude, however, that Ross and Norman had a "good heart" in their use of the system. Once Ross and Norman had the availability of the Dudek program to generate hypothetical test results, they marketed the system based on 1983–84 hypothetical trading results. Although Norman testified that 4.25 cents was a parameter which he learned from brokers at Merrill Lynch, Johnson's analysis reflects that 4.25 cents was an optimized parameter based on 1983–84 soybean trading data, without adjusting for slippage. In statistical testing parlance, 4.25 was a "curve fit" result, used to show a best case scenario for trading soybeans during 1983–84 on the system. (Tr. at 1283–87; Trial Exs. 40, 56 at 23–25).

Testing performed by Johnson demonstrates that the use of an arbitrary parameter of 4.25 has only slightly better than a fifty percent chance of being predictive of

47. John Hill and Lee Brooks were originally designated as Rule 26 experts by Bradford, for the purpose of testifying as to the validity of the system, and, additionally for Brooks, Bradford's compliance with disclosure and supervisory requirements. Trial Ex. 61. Bradford failed to call Hill or Brooks as witnesses. The Court may draw a negative inference from the failure of a party to call as a witness an expert designated by that party prior to trial. See 75A Am.Jur.2d Trial § 603 (and cases cited therein at nn. 48 & 49); Wilson v. Merrell Dow Pharmaceuticals, Inc., 893 F.2d 1149, 1150–51 (10th Cir.1990); United

States v. Buchbinder, 796 F.2d 910, 919 (7th Cir.1986). The Court should infer that the testimony of Hill and Brooks would have been unfavorable to Bradford and would have been contrary to the matters designated in Bradford's interrogatory answers.

48. On cross examination, it was shown that Weiner, while testifying as an expert in another case, admitted that he did not know whether or not a broker needed a reasonable basis to recommend a trade. (Tr. At 1967–70).

future market movement. (Trial Ex. 56 at 22–23). This percentage conveyed no real advantage over nonsystem trading and did not limit loss. Johnson also demonstrated that 4.25 does not generate the lowest commissions and lowest draw down. Using the Dudek computer program furnished by Bradford, Johnson demonstrated that, after adjusting for slippage, a parameter of 8.8 for soybeans would generate more profits, lower commissions, and less draw down than 4.25. (Trial Ex. 56 at 28–29; Tr. at 1286–91).

Dr. Teweles testified that the system's failure in most of the tested markets over time was indicative that the system was not a viable system. (Tr. at 933–34). Dr. Teweles testified it was inappropriate for Ross to solicit Cannon to return to system trading in 1992 in light of Ross' prior experience with the system. (Tr. at 945–46). Use of the system was not justified because of Ross' reliance upon 2–, 3–, and 10–month moving averages for making position recommendations given the short term nature of the system. (Tr. at 1520).

The record indicates that there was no reasonable basis for the spread trading recommended by Ross and conducted in Cannon's account. Ross' personal trading record provides no basis for believing that Ross had any special expertise in trading spreads. At trial, Ross testified that the spreads were recommended because there was a "full carry" market. A review of the order tickets, however, indicates that the trades were not "full carry" spreads. (Tr. at 1362). There was no proof offered indicating that Ross' spread trading recommendations were based upon Bradford's research department. To the extent Ross based trading decisions on fundamental factors, the record demonstrates that most of the markets and trades selected by Ross generated significant losses. (Tr. at 1365–66).

Bradford offered testimony from John Fisher, who had been designated by Bradford as a Rule 26 expert in pre-trial discovery and whose report was filed with the Court in pretrial proceedings, ostensibly to show, *inter alia*, that the system provided a reasonable basis for trading.[49] Fisher was tendered to the Court as an expert in the testing of commodity trading systems as well as commodity trading systems generally. (Tr. at 1564). On direct examination, Fisher testified that he tested Ross' system using opening price, not opening range, data in 1987. On voir dire, Fisher admitted that he could not recall any of the specific financial results of his 1987 test but admitted that he had basically an updated version of the same computer program which he utilized in 1987, had access to the same historical data, and was capable of replicating his 1987 test but did not do so.

During the course of his direct examination, Fisher expressed opinions on commodity testing procedures, the results of his 1987 testing based on opening price, the difference between opening range and opening price, and the profitability of trades which followed a day trade under the system. On cross-examination, counsel for the plaintiff sought to examine Fisher concerning Fisher's report. Counsel for Bradford objected on the grounds that Bradford was not seeking to introduce Fisher's report as part of his expert testimony. Subsequently, the Trustee renewed his motion to strike Fisher's testimony including, as grounds therefore, Bradford's withdrawal of Fisher's report. Based on the briefs and argument of counsel, this Court granted the Trustee's motion to strike all of the opinion testimony of Fisher, including any opinions as to the results of the testing done in 1987 based on opening price.

Even if the court had allowed Fisher's opinion testimony, the Record reflects that the testimony was not credible. A negative inference must be drawn from Fisher's failure to replicate the 1987 test when he had the means to do so (including the Dudek program which was capable of simulating

---

49. Prior to trial, the Trustee filed a Motion in Limine to exclude or disqualify Fisher as an expert witness, or alternatively, to strike portions of Fisher's amended report to the extent Fisher's opinions were based upon tests done by Fisher in 1987 for which no evidence other than Fisher's recollection remained. At the commencement of trial, the Court denied the Trustee's motion to exclude Fisher but reserved ruling on the Trustee's motion to strike testimony and opinions based on the 1987 testing. (Tr. at 52–54).

trading at the open and at the opening range) and from Bradford's withdrawal of Fisher's expert report during the midst of trial. The Court cannot ignore the fact that prior testing done by Fisher in connection with his original report was based on data and a methodology, which when questioned by the plaintiff, proved to be flawed. Since Fisher's 1987 testing was based upon opening price, not opening range, the only hypothetical testing results before the Court are those results generated by the Dudek program by Ross and Norman, and by the plaintiff's expert, Ron Johnson. Johnson's test results are the only hypothetical tests which account for slippage, and show results considerably worse than Fisher's recollection of his 1987 test on opening price. Accordingly, there is no credible proof as to the results of the 1987 test by Fisher or that test results based on opening price are not statistically different from tests based on opening range. The Court finds that Fisher's recollection of 1987 testing, in lieu of replicating the test and subjecting it to the scrutiny of the Court

and the plaintiff, does not materially assist the Court in resolving this matter.[50]

## B. ROSS AND BRADFORD COMMITTED FRAUD UNDER CEA §§ 4b & 4o and COMMONLAW.

Fraud by an FCM or AP is actionable under §§ 4b of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 6b.[51] Similarly, fraud by a CTA is actionable under § 4o of the CEA, 7 U.S.C. § 6o.[52] The anti-fraud provisions under CEA § 4o are generally regarded as broader than their counterparts of CEA § 4b. *See First National Monetary Corp. v. Weinberger ("Weinberger"),* 819 F.2d 1334, 1340 (6th Cir.1987). Pursuant to CEA § 2(a) and the common law doctrine of *respondeat superior,* Ross and Bradford may be held jointly and severally liable for Ross' fraudulent conduct. *See* 7 U.S.C. § 4 (1922) (establishing liability of principal for acts of agent). The elements of commodities fraud under CEA §§ 4b & 4o are essentially the same as under the common law.[53] *See Wein-*

---

**50.** Proof that the system was tested by Futures Truth on opening price and that the results were good, by itself, proves little about the trading in Cannon's account. See e.g. *CFTC v. Maseri,* 2 Com. Fut. L.Rep. ¶ 27,230 (S.D.Fla.1997)( finding that solicitation and trading of accounts based on trading system which Futures Truth, Inc. had previously given a "number one ranking" was fraudulent.)

**51.** CEA § 4b, 7 U.S.C. § 6b, provides in pertinent part:

(a) It shall be unlawful (1) for any member of a contract market, or for any ... agent or employee of any member, in or in connection with ... any contract of sale of any commodity in interstate commerce ...

(i) to cheat or defraud or attempt to cheat or defraud such other person;

(ii) willfully to make or cause to be made to such other person any false record thereof;

(iii) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract ...

7 U.S.C. § 6b (as amended Nov. 10, 1986).

**52.** CEA § 4o provides that:

(1) It shall be unlawful for any commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or

(B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

7 U.S.C. § 6o (as amended Jan. 11, 1983).

**53.** In an action for common law fraud, the following elements must be proven, by a preponderance of the evidence:

(1) That the defendant intentionally misrepresented or omitted a material fact, or produced a false impression in order to mislead another, or to obtain an undue advantage over him.

(2) That the misrepresentation or omission was made with knowledge of its falsity and with a fraudulent intent or reckless disregard for the truth.

(3) That this misrepresentation or omission was material.

(4) That the plaintiff reasonably relied upon the misrepresentation or omission.

(5) That the plaintiff's reliance upon the misrepresentation or omission was the proximate cause of the plaintiff's injury.

*See First National Bank of Louisville v. Brooks Farms,* 821 S.W.2d 925 (Tenn.1991); *City State Bank v. Dean Witter Reynolds, Inc.,* 948 S.W.2d 729 (Tenn.App.1996) (relating to investor's claim of securities fraud).

*berger,* 819 F.2d at 1340. In order to sustain a claim of fraud under either § 4b or § 4o, the Trustee must prove, by the preponderance of the evidence, that:

  (1) Ross or Bradford misrepresented or omitted a material fact which was intended to induce reliance on the part of Cannon;

  (2) Cannon reasonably relied on the material misrepresentation or omission; and,

  (3) Cannon's reliance on the material misrepresentation or omission proximately caused damages.

*Id.* at 1340.

A statement or representation is material if there is "a substantial likelihood that a reasonable investor would consider it important in making an investment decision." *Id.* (quoting *Saxe v. E.F. Hutton & Co.,* 789 F.2d 105, 111 (2d Cir.1986)).[54] A broker's misrepresentations concerning his own knowledge and experience are considered material and are actionable under the CEA. *See id.* (citing *Psimenos v. E.F. Hutton & Co.,* 722 F.2d 1041, 1044 (2d Cir.1983)); *Annee v. First Commodity Corp. of Boston,* [1987–90 Transfer Binder] Comm. Fut. L. Rep. ¶ 24,150 (CFTC 1988)(A broker's expertise and trading record are material facts which a reasonable investor would consider important in deciding to invest).

Under NFA Rules, Bradford had the obligation to disclose to Cannon the risks associated with trading futures, which would include all material risks about the system, as well as any risk associated with the persons who created the system and traded it. NFA Rule 2–30; 17 C.F.R. §§ 1.55, 4.31, 33.7, and 31.11. (9/17/97 Kitchen Dep., pp. 41–43). Bradford also had the duty to comply with all aspects of NFA Rule 2–29. (9/17/97 Kitchen Dep., p. 43).

The record demonstrates that Ross and Bradford made numerous misrepresentations and omissions of material information concerning the System and the trading which took place in Cannons account:

  (a) Ross and Bradford knew or were reckless in not knowing and failed to disclose that the system was an unproven trading idea, which had been improperly tested by failing to consider and accurately determine the effect/frequency of trading, frequency of day trades, slippage, drawdown, market gaps, limit moves and commissions based on daily data.

  (b) Ross and Bradford knew or were reckless in not knowing and failed to disclose that Ross and Norman had never utilized the trading idea for discretionary accounts and had no actual track record of the system ever having been used by anyone for discretionary accounts.

  (c) Ross and Bradford knew and either willfully or recklessly failed to disclose, that there was no logical, theoretical, or scientific basis for believing that the Reversal System was a viable trading system, or that it could be reasonably expected to produce profitable results on a consistent basis.

  (d) Ross and Bradford knew or were reckless in not knowing and failed to disclose that the system had a major design error or "fatal flaw" which permitted theoretically unlimited losses under certain market conditions. It was reckless for Ross to trade (and for Bradford to permit Ross to trade) large positions in Cannon's account in light of the fatal design flaw.

  (e) Ross and Bradford failed to disclose material money management considerations which jeopardized their clients, particularly the true extent of the system's maximum drawdown[55] as demonstrated by Bradford's actual track records and the equity needed to trade the system.

---

**54.** NFA defines material information as "information which could influence someone's decision to invest". Trial Ex. 45, p. 7.

**55.** To the extent the equity requirements of $20,000 per contract in Ex. 39 were predicated on margin requirements plus two times the projected drawdown, it is manifest that Ross and Bradford materially misrepresented the actual drawdown. By March 1992, the actual maximum drawdown on a single contract of soybeans was $21,338. (Trial Ex. 56, p. 60).

(f) Ross and Bradford knew or were reckless in not knowing and failed to disclose that the system could generate excessive commissions which precluded profitability.

(g) Ross and Norman represented that the system worked well in volatile markets, when, in reality, volatility increased the number of day trades which are always unprofitable. (Tr. at 1334).

(h) It was represented that the system would let profits run and cut losses short when the system, in fact, did neither. (Tr. at 1333).

(i) It was reckless and misleading to solicit Cannon by representing that the system had been very successful to date in trading treasury bonds and cotton futures while failing to disclose that the representation was based on a one month trading analysis. (Tr. at 1334).

(j) It was deceptive and misleading to represent that Bradford was confident that the system would generate positive results over the long term when, in fact, the paper trading and actual results over a short period of time did not provide a basis for a long term prognosis.

(k) It was deceptive and misleading to suggest that the system would perform well over the long term without disclosing that Ross and Norman considered "long term" to encompass their careers until retirement.

(*l*) Ross and Norman failed to disclose the background of Ross and Norman as traders, their lack of experience in managing discretionary accounts and developing trading systems. (Tr. at 1338–39).

(m) In soliciting Cannon to resume trading, Ross failed to disclose that the system had failed in virtually all of the markets where it had been traded.

(n) Ross knew or was reckless in not knowing that there was no reasonable basis for representing to Cannon that he could recoup his losses if he continued to trade the system.

(o) It was misleading and deceptive for Ross to represent that the system could make money going both ways in the market. In actuality, the system only performs well in a particular type of market and most of the time does not make money.

(p) It was misleading and deceptive for Ross to represent that the system had been improved. In reality, nothing had been done to eliminate the day trading problems or the fatal design flaw in the system. (Tr. at 1361).

(q) It was deceptive and misleading for Ross to omit to disclose unfavorable track records on soybeans which were material information which should have been disclosed to Cannon in connection with the opening of his account and in connection with continued trading in his account. (Tr. at 215).

Ross and Norman had the ability to test the system with slippage as early as 1988 and were aware that slippage could have a significant impact on profitability. (Tr. at 243–244, 1293, 1995; Trial Ex. 56, p. 28, and Trial Ex. 57). Despite this ability, Ross and Norman curve-fitted 1983–84 soybean data to optimize the system without slippage and marketed those curve fit results, which represented the best possible scenario. (Tr. at 1347). The 1983–84 soybean hypothetical in Trial Ex. 40 reflected an average transaction of $156.23 profit, which was misleading and deceptive in light of the failure to consider slippage and commissions.[56] In fact, when slippage and commissions are taken into consideration, the actual average transaction based on the same hypothetical test is only $53.00 per trade.[57] A $53.00 average trade resulted in a risk

---

56. While the cover letter which accompanies the Exhibit 40 makes reference to the possible effects of slippage, the letter fails to disclose how much slippage should be deducted and does not disclose that commission fees were not deducted in determining the average trade. (Tr. at 1343–44).

57. Although Norman testified that $53.00 per trade was still a good figure, Johnson testified that a performance of $53.00 is not acceptable in relation to the risk being assumed, particularly since most "good" systems on the market had average trades of between $250.00 and $450.00 per trade. (Tr. at 1307–08).

ratio of eight to one, meaning that the customer would risk $8.00 to get $1.00. (Tr. at 1307–08). By failing to include slippage, Exhibit 40 also misrepresented the actual amount of drawn down generated by the test. Though drawdown was not expressly stated, Exhibit 40 reflected a draw down of $6,600, whereas, once slippage was considered, the real draw down was approximately $9,000. (Tr. at 1309). Since drawdown was essential to proper money management principles as well as knowledge of risk, misrepresentations concerning drawdown were material, as well as misrepresentations concerning average trade profitability. The use of Exhibit 40 to solicit customers for the system was deceptive and misleading. The omission of slippage, given Ross and Norman's knowledge of slippage as a cost of doing business, was willful.

While Exhibit 40 typifies how Ross and Norman deceptively presented system result in order to attract and maintain customers [58], the use of curve fit optimized results without slippage on 1983–84 soybean data to trade the system was itself fraudulent. When the Dudek program is used to blind test the 4.25 parameter against subsequent data from December 20, 1984 through December 29, 1987, the test printout reflects an actual average trade of $100.26. When this figure is adjusted for commissions, the average trade drops to $47.85. When slippage is considered, the average trade drops to minus $2.28. (Trial Ex. 56 at 26). Since Ross and Norman clearly had this information available to them by early 1988, it is reasonable to infer that they knowingly excluded slippage when testing, marketing, and optimizing the system in order to mislead and deceive the public and Cannon as to the profitability of the system. While the Record reflects that Ross and Norman's conduct was deliberate and intended to deceive, at a minimum, their testing and optimizing of the system was made in reckless disregard of the true results which would have been generated by considering slippage and conducting appropriate blind tests. Ross' testimony that the 4.25 cents parameter was the best parameter over time and resulted in the most profit and the least drawdown is not credible in light of their knowing failure to include slippage in their testing and the results of Johnson's testing. When asked why slippage was not taken into account in generating hypothetical results using the Dudek program for marketing purposes, Ross testified he could not remember why slippage was not included. (Tr. at 244). The reasonable inference is that Ross and Norman failed to include slippage in their hypothetical test results because they wanted to portray the best possible results to prospective customers while maximizing commissions.

The system also had a problem with excessive day trade losses. Under the reversal system, day trades are always losses. Although it was represented to Cannon that the system stop orders would render commodity trading less risky because the system would cut losses short, in fact, on a volatile trading day, the system exacerbated, rather than limited, losses. The failure to disclose this risk especially in light of representations to the contrary, is a material non-disclosure of risk. The record reflects that when Ross and Norman back tested the system on historical data, they were unable to determine the extent to which day trades would occur. When Ross and Norman later optimized the system at 4.25 cents based on 1983–84 data, however, almost forty percent of the gross losses were created by day trading. Trial Ex. 40. In reality, approximately thirty percent of Cannon's total losses were the result of day trading.[59] Trial Ex. 56, p. 44. Cannon was not told about day trading prior to opening his account and, once Cannon incurred day trades, he was told by Ross that improvements were always being made to the system to reduce the amount of day trades. Jackie Russell, however, testified the parameters remained constant during

---

**58.** Proof of Ross' marketing activity is relevant to show that conduct was intentional, deliberate, and not the product of mistake, without regard to of specific reliance by Cannon. *See Jordan v. Clayton Brokerage Co. of St. Louis,* 861 F.2d 172, (8th Cir.1988)

**59.** On August 30, 1993, Cannon lost $130,448 on a single day trade of a one million bushel position. Trial Ex. 56, p. 30.

1992 through 1994. Since the level of day trading was directly related to the parameter, the representations made by Ross to Cannon that the system was being improved to reduce day trading were false and were made with intent to induce Cannon, who had become Ross' largest customer, to continue trading.

## C. SCIENTER/RECKLESSNESS

While fraud under § 4*b* and at common law requires proof of scienter, there is no requirement of proof of scienter with respect to a CTA acting in a fiduciary capacities. *See Weinberger,* 819 F.2d at 1341–42; CEA § 4*o.* Since the proof shows that Ross acted as a CTA, the Trustee need only prove that Ross intentionally made a statement to Cannon, and that the statement contained a material misrepresentation or material omission. *Id.* The Trustee does not have to prove that Ross specifically intended to defraud Cannon in so doing. *Id.*

Even if Ross was not deemed to be a CTA, the record reflects that Ross had the requisite scienter and fraudulent intent under both the CEA and common law. The Record reflects that:

(a) Ross knowingly optimized the system without consideration of slippage, when he knew that slippage would occur and would have an impact on profitability;

(b) Ross knowingly used 4.25 as a parameter when testing available to Ross (and which Ross said he conducted) would have shown that 4.25,after adjusting for slippage, would yield unprofitable results and that a 8.8 parameter would have produced more profit, less drawdown and lesser commissions;

(c) the October 1986 letter made representations which were untrue and were designed to mislead Cannon into trading the system;

(d) Ross misrepresented that the system had been improved in 1992, failed to disclose numerous system failures in different markets, and traded in markets where the system had failed;

(e) Ross recommended all of Cannon's trades, including trades against the system

and spreads which had no reasonable basis;

(f) Ross traded Cannon's account while it had outstanding margin calls and/or debit balances in violation of NFA, Exchange, and/ or Bradford's rules;

(g) Ross induced Cannon to continue trading in the face of huge losses by suggesting that Cannon had to remain in the market to win back his losses, where such a representation lacked any reasonable basis and was in reckless disregard of the facts;

(h) Ross knowingly failed to disclose that the system had a major day trade problem and that design flaws in the system would expose Cannon to unnecessarily large trading risks.

Conduct is reckless if a broker acts in disregard of risk so obvious that a broker must be taken to have been aware of it and risk is so great as to make it highly probable that harm would follow. *Mayoza v. Heinold Commodities, Inc.,* 871 F.2d 672 (7th Cir. 1989); *see also Commodity Futures Trading Com'n v. American Metals,* 775 F.Supp. 767 (D.N.J.1991)(Reckless action is one that departs so far from standards of ordinary care that it is difficult to believe the actor was not aware of what he was doing).

Under the present facts, where there are material omissions and affirmative misrepresentations concerning the risk of the system, Bradford may not rely upon Cannon's receipt of the risk disclosure statement as satisfying its duty to disclose. *JCC, Inc. v. CFTC,* 63 F.3d 1557 (11th Cir.1995); *McAnally v. Gildersleeve,* 16 F.3d 1493 (8th Cir.1994); *Smith v. First Commodity Corp. of Boston,* [1987–90 Transfer Binder] Comm.Fut.L.Rep. (CCH). ¶ 24,163 (CFTC 1988)(risk disclosure statement rendered ineffective by verbal statements that AP would use computerized trading system to minimize downside risk).

## D. LULLING, RATIFICATION AND STATUTE OF LIMITATIONS

Bradford contends that Cannon knew or should have know of any deficiencies in the system by March of 1992 when he resumed trading and that any disclosure omissions

relating to slippage, day trades, and the fatal flaw should have been known. Bradford also argues that Cannon's losses should have alerted Cannon to problems with the system. As a result, Bradford argues that Cannon ratified any misconduct and assumed the risk of trading. The record reflects that while Cannon suffered large losses as early as September of 1992, Cannon was lulled in continuing trading by the representations of Ross that the system could win back the money lost and that Cannon had to be in the market in order to make it back. Cannon was further lulled to believing the money could be made back by Ross' recommendations that Cannon increase the size of his positions based on Ross' perception of an impending bull market. Cannon continued to trade in reliance upon Ross' representations as to the ability of Ross and the system to make back losses after Cannon suffered huge losses in August 1993. The CFTC has recognized that lulling itself is a form of fraud under CEA § 4(b). *Parciasepe v. Shearson, Hayden, Stone, Inc.*, 1985 WL 56215, at *4, [1984–86 Transfer Binder] Com. Fut. L.Rep. (CCH) ¶ 22,464 (CFTC 1985); *Buckler v. ING Securities Futures & Options*, 1998 WL 439345, *1, *8, [1998] Comm. Fut. L. Rep. (CCH) ¶ 27,379 (CFTC 19988). In *Buckler*, the CFTC recognized that:

> It has been noted that "[c]ustomers faced with such losses often are prone to make poor decisions in a desperate attempt to recoup losses. As losses can occur with astonishing speed, disoriented customers can be receptive to lulling or unreasonable recommendations that lead to even more losses."

Id. at 46,727–28.

While Cannon was clearly desperate to recoup his losses, his willingness to put additional funds at risk was directly related to Ross' representations. *See Frye v. Northpoint Agricultural Resource Inc.*, 1991 WL 160488, aff'd 1992 WL 239068, [1990–92 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 25,076 (CFTC 1991) (Broker defrauded customer who traded for 2 years by continual assurances that more time was needed for trading program to work). In reality, however, neither the system nor Ross' skills as a trader had any reasonable prospect of recouping Cannon's losses.

To establish a defense of ratification, a customer must have full knowledge of all the facts. *Herman v. T. & S. Commodities, Inc.*, 592 F.Supp. 1406 (D.C.N.Y.1984). Moreover, the idea of ratifying a fraud is misplaced unless the party is aware that the prior act was, in fact, a fraud. *Smith v. First Commodity Corp. of Boston*, [1987–90 Transfer Binder] Comm.Fut.L.Rep. (CCH). ¶ 24,163 (CFTC 1988). In the present case, Cannon relied on representations that he needed to stick with the system in order to recover his losses. Until a customer is apprised of all the material risks of trading, his continued trading is premised on reliance upon the broker's misrepresentations as to the risks involved or the broker's failure to disclose such risks. When either of these situations occurs, the broker will be liable for losses resulting therefrom. *Clayton Brokerage Co. of St. Louis, Inc. v. Commodity Futures Trading Commission*, 794 F.2d 573 (11th Cir.1986). In the present case, it is clear that Cannon was never apprised of all the material risks of the system or of Ross' mediocrity as a trader and desperately continued to trade the system and follow Ross' advice in the desperate belief that it was the only way he could recover his losses. Accordingly, Cannon cannot be deemed to have ratified Ross' fraud.

Bradford's assertions that Cannon is responsible for his own losses by trading excessively large positions is undercut by the fact that Bradford failed to disclose material information to Cannon about the system and Ross' background as a trader. Bradford failed to ascertain Cannon's risk capital; Bradford failed to issue commodity account inquiry forms despite excessive commission to equity ratios and losses; Ross recommended that Cannon increase his positions based on Ross' perception of a bull market; Ross placed trades going against the system; and Ross continued to trade Cannon's account while the account had debit balances and/or was under margined. The record reflects that Cannon, though eager to recover his losses and make money to put into his escrow account, nevertheless believed Ross'

continued assertions that the system was a legitimate way to make money and recover his losses and further believed that the system minimized the risk of commodity trading. There is no evidence to suggest that Cannon wished to trade for the sake of trading or that Cannon would have continued to trade but for his belief in the system and Ross' continued representations that Cannon could make back the money if he continued to trade. (Tr. at 1413–14; Trial Ex. 56).

Each omission and/or misrepresentation in this case is material because the Defendants failed to disclose information necessary for Cannon to make an informed decision relative to trading with Bradford and Ross. In each instance, even if the material omission and/or misrepresentation was first made, or first occurred, prior to March 1992, no revelation of the omission or correction of the misrepresentation was made prior to March 1992. Accordingly, as a matter of law, the omissions and/or misrepresentations constitute a continuing tortious act under *Clifton v. Bass*, 908 S.W.2d 205, 209 (Tenn.App.1995). The ongoing nature of the material omissions and/or misrepresentations is also indicative of lulling or active concealment. *See Jarrett v. Kassel*, 972 F.2d 1415 (6th Cir.1992), *cert. denied*, 507 U.S. 916, 113 S.Ct. 1272, 122 L.Ed.2d 667 (1993); *Vance v. Schulder*, 547 S.W.2d 927 (Tenn.1977).

## XII. CHURNING

Churning has been defined as excessive trading in an account over which the broker has control for the primary purpose of generating commissions. *See Khalid*, 720 F.Supp. 671. It describes a "particular species of unauthorized trading" which provides a separate and additional claim when high commission charges stem from an amount of trading that exceeds what is appropriate for the customer's investment goals [60]. *See Evanston Bank*, 623 F.Supp. at 1024; *See also Craighead v. E.F. Hutton & Co.*, 899 F.2d 485 (6th Cir.1990). Such trading constitutes a breach of the broker's fiduciary duty to his customer. *See Khalid*, 720 F.Supp. at 677.

**60.** Churning is included in the implied right of action for fraud, misrepresentation or deceit un-

## A. ELEMENTS OF CHURNING

The elements of churning are as follows:

(1) That the volume of trading in the investor's account was excessive in light of the investor's objectives.

(2) That the broker exercised control over trading in the account.

(3) That the broker acted with the intent to defraud or with willful and reckless disregard for the investor's interests.

*Craighead*, 899 F.2d at 489; *see also Memphis Housing v. Paine, Webber, Jackson & Curtis*, 639 F.Supp. 108 (W.D.Tenn.1986).

## B. ROSS CONTROLLED THE ACCOUNT

Bradford's expert, Weiner, acknowledged that when an AP has discretionary authority over an account, there is a rebuttable presumption that the AP has control. (Tr. at 1813). The factors considered in determining whether a broker exercises *de facto* control over a *nondiscretionary* account include:

(a) Lack of customer sophistication;

(b) Lack of prior commodity trading experience by the customer and a minimum of time devoted by the customer to trading in the account;

(c) A high degree of trust and confidence reposed in the AP by the customer;

(d) A large percentage of transactions entered into by the customer based upon recommendations of the AP;

(e) Absence of prior customer approval for transactions entered into on his behalf;

(f) Customer approval of recommended transactions where approval is not based upon full, truthful, and accurate information supplied by the AP.

*Lehman v. Madda Trading Company*, 1984 WL 48703, [1984–86 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 22,417 (CFTC 1984); *Hinch v. Commonwealth Financial Group*, [1997] Comm. Fut. L. Rep. (CCH) ¶ 26,677 (CFTC 1997). Although Cannon granted discretionary authority to Ross, these factors are relevant in determining whether Bradford has rebutted the presumption of control.

der CEA § 4b. *See Evanston Bank*, 623 F.Supp. at 1024.

The following facts reflect that Ross had control over the trading in the account:

(a) Cannon was not a sophisticated trader.

(b) Cannon signed a power of attorney granting trading authorization to Ross.

(c) The account statements all show that the account is discretionary.

(d) Ninety-one percent of the order tickets are marked discretionary and a number of the tickets that are marked non-discretionary should have been marked discretionary.

(e) Ross suggested all of the trades. Cannon always followed the advice of Ross. (Tr. at 227–228).

(f) A close relationship existed between Ross and Cannon and Cannon placed complete trust in Ross.

(g) Cannon devoted little time to the actual trading in the account.

(h) Ross determined the commodity, contract month, parameter, and Ross' system determined the price and whether to buy or sell.[61]

(i) Ross would recommend increases in the number of contracts being traded when Ross perceived a bull market.

(j) Ross' placed trades against the system, departed from the reversal system based on fundamentals, and traded the account while it was under margined or in a debit position in violation of exchange rules and Bradford's rules.

Thus, in spite of a presumption of control, proof of Ross' actual control is overwhelming.

## C. TRADING WAS EXCESSIVE IN LIGHT OF CANNON'S OBJECTIVES

Factors considered in determining whether trading is excessive include:

(1) A high commission to equity ratio.[62]

(2) A high percentage of day trades.

(3) The broker's departure from a previously agreed upon trading strategy.

(4) Trading in the account while it was under margined.

(5) Whether the broker engaged in "in-and-out" trading (i.e., rapid acquisition and divestment of commodities of an ever-changing nature, e.g., bonds to soybeans to cotton, etc.).

*Craighead*, 899 F.2d at 490 (citing *Costello v. Oppenheimer & Co.*, 711 F.2d 1361 (7th Cir. 1983)); *Hinch v. Commonwealth Financial Group*, [1997] Comm. Fut. L. Rep. (CCH) ¶ 26,677 (CFTC 1997).

The Record reflects that Cannon's account was excessively traded by Ross. The factors which demonstrate this fact are:

(a) a very high commission to equity ratio;

(b) the account was traded on the basis of a one hundred percent risk of ruin;

(c) Ross recommended over 30 different markets be traded;

(d) Ross traded the account while under margin and/or debit;

(e) Ross went back and forth between a strategy of system trading and non-system trades, including trades which went against the system, and would fluctuate from reversing and not reversing the system;

(f) Ross optimized the system without considering slippage and utilized a trading parameter which generated more trades, more commissions, larger draw downs, and less profit; and

(g) the system had an excessive number of day trades.[63]

(Tr. at 1404–1410; Trial Ex. 56).

The trading in Cannon's account was excessive in relation to his investment objectives. Cannon's investment objective was to make money. The manner in which the account was traded was such that this objective could not be met. (Tr. at 1429). Based on

---

**61.** Ross' determination of these various elements of the trade render the trade discretionary under the rules of the NFA and the CBOT. (Exhibits 44–46; CBOT Rule 423; Tr. at 1387—1394).

**62.** The CFTC has held that a C/E ratio in excess of 18% per month or greater, is an established indicator of churning. *Garland v. J.C. Bradford*

*Co.*, 1986 WL 65820, [1986–87 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22, 155 (CFTC 1986).

**63.** Approximately 30% of Cannon's losses were generated by day trades and 65% resulted from short term trading of five days or less. Trial Ex. 56, p. 44.

the actual track records maintained by Bradford, and Ross' own track record as a trader, it was not reasonable to believe that Cannon's account would generate sufficient profits to pay these commissions. (Tr. at 1326, Trial Ex. 7 and 56, p. 15). During the second trading period, only thirty percent of Cannon's trades were profitable and the expected return on an average trade was minus $1640. The pay off ratio was .91. Based on these figures, Cannon had a one hundred percent probability of ruin. (Tr. at 1327).

Ross had a fiduciary duty to handle Cannon's account such that the trading was not in excess of the funds in the account. Rather than require Cannon to put sufficient equity in the account, Ross allowed the account to be traded with a minimum amount of equity needed to satisfy margin requirements. (Tr. at 1431–33). While there is no specific rule for requiring ascertainment of risk capital, the failure to ascertain risk capital requires that a discretionary account be traded in a manner which is not excessive in relation to the funds actually in the account. (Tr. at 1368; Tr. Ex. 46, § 423.03). Since Bradford never ascertained Cannon's available risk capital, the only equity which Bradford could rely upon was the equity in the account. (Tr. at 1325). Ross recommended trades which were often 50 to 60 times too large based on the equity in the account. (Trial Ex. 56, p. 41). Bradford was well aware that Cannon was risking more than 100% of his account equity.

Under sound money management principles recognized in the commodity industry, an account should have equity of at least three to five times the maximum draw down per contract traded. Accordingly, based on Ross and Norman's 1983–84 hypothetical without slippage, the customer should have minimum equity of approximately $20,000 per contract to trade a system which had a maximum draw down of $6600.00 per contract. (Tr. at 1311). When Cannon resumed trading in March of 1992, the system had generated a maximum draw down of $21,338, which would have required approximate-

ly $64,000, plus margin, to trade one contract.[64]

The trading of Cannon's account while a margin call was outstanding violated CBOT Rules. The trading of Cannon's account while under margin was in violation of accepted industry money management principles and was reckless. (Tr. at 1330–1331). At the time Cannon was trading one million bushels of beans while under margined, he had already lost $185,000, when his liquid assets were only reported to be $250,000. It was reckless for Ross to continue to trade Cannon's account under these circumstances. (Tr. at 1331–32; Trial Ex. 58).

### D. SCIENTER/RECKLESSNESS

The same findings set forth above also support proof of scienter with respect to the Trustee's churning claim. Ross' use of a parameter of 4.25, instead of 8.8, in view of his awareness that slippage was a factor and his ability to test for effects of slippage, leads to the inescapable and reasonable inference that Ross sought to generate higher commissions while generating, in Ross' view, enough profit to keep customers trading for long periods of time. This inference in bolstered by the fact that Ross repeatedly told Cannon that losses were to be expected under the system, and that Cannon needed to stay in the market and continue trading if he hoped to generate profits to win back his losses. (Tr. at 1411–13; Trial Ex. 56 at 70–71). Finally, Ross' trading of Cannon's account without adequate equity and sometimes while under margin or in a debit position demonstrates Ross' greater interest in generating commission rather than acting like a fiduciary.

### XIII. TENNESSEE CONSUMER PROTECTION ACT

This Court previously determined that the Tennessee Consumer Protection Act ("TCPA"), T.C.A. § 47–18–101, et seq., is applicable to the purchase and sale of futures contracts. Memorandum Opinion and Order re Plaintiff's Motion for Partial Summary Judgment and Defendant's Motion for Sum-

---

**64.** In actuality, the actual draw down for a single contract of soybeans when Cannon's account was closed was approximately $33,000. (Tr. at 1312).

mary Judgment, July 15, 1998. The TCPA proscribes unfair or deceptive acts or practices affecting trade or commerce. T.C.A. § 47–18–101.[65] The TCPA is to be liberally construed to protect consumers and others from those who engage in deceptive acts or practices. T.C.A. § 47–18–102; *see also Morris v. Mack's Used Cars*, 824 S.W.2d 538, 540 (Tenn.1992) (citing *Haverlah v. Memphis Aviation, Inc.*, 674 S.W.2d 297, 305 (Tenn. App.1984)). Where the language contained within the four corners of a statute is plain, clear, and unambiguous, there is no room for interpretation or construction, and courts must apply the words of the statute. *Pursell v. First Am. Nat'l Bank*, 937 S.W.2d 838, 840–42 (Tenn.1996) (construing the TCPA).

Under the TCPA, causes of action are not limited to cases of fraudulent and willful conduct on the part of defendants. *See Smith v. Scott Lewis Chevrolet, Inc.*, 843 S.W.2d 9 (Tenn.App.1992). An unfair or deceptive act affecting trade or commerce need not be knowingly made in order to sustain a cause under the TCPA. *Id.* It merely must be unfair and deceptive, and it must affect the trade or commerce of this State. *Id.*

Cannon meets the definition of a *"consumer"* in Tenn.Code Ann. 47–18–103(2). Likewise, it cannot be contested that Bradford and Ross were engaged in *"trade or commerce"*, defined in Tenn.Code Ann. § 47–18–103(9) as "the advertising, offering for sale, lease or rental, or distribution of any goods, services, or property, tangible or intangible, real, personal or mixed, and other articles, **commodities**, or things of value wherever situated." *See ibid.* (emphasis added). A commodity futures contract is a "commodity". T.C.A. § 47–18–103(2) and (9).[66] *See also Hand v. Dean Witter Reynolds Inc.*, 889 S.W.2d 483 (Tex.App.—Houston 1994).

The fraudulent actions of Bradford and Ross described previously in connection with the solicitation and trading of Cannon's account constitute unfair and deceptive acts affecting trade or commerce under the TCPA for which the Trustee is entitled to recover.

## XIV. NEGLIGENCE—FAILURE TO SUPERVISE

Bradford failed to properly adopt and enforce branch office supervisory procedures regarding customer information and risk disclosure as required by NFA Rule 2–9. (Tr. at p. 1806). Bradford failed to properly supervise Ross by failing to insure that all risk of the system and the system trader were disclosed. Instead, Bradford gave only the minimum required disclosure. (Tr. at 1366–67).

Bradford failed to supervise Ross and Norman by approving promotional literature such as are reflected in Exhibits 8, 39 and 40. The record is clear that Bradford never independently verified the basis of the system or determined why it did or did not work, in violation of NFA Rule 2–29. Without making an independent determination as to the system's validity, it could not be possible for Bradford to know whether or not representations contained in the promotional material were misleading or deceptive. Merely, looking at paper trading or back testing results would be insufficient for this purpose. (Tr. at 1369–70). The testing in North Carolina did not satisfy this duty since there is no persuasive evidence as to the results and it is uncontradicted that Fisher conducted tests on the opening price, not opening range, contrary to how the system was actually traded.

Bradford was further not able to supervise the discretionary trading done on the account since it is not possible to identify a system

---

**65.** A broadly worded act, the TCPA defines "trade or commerce" as encompassing "the advertising, offering for sale, lease or rental, or distribution of any goods, services, or property, tangible or intangible, real, personal or mixed, and other articles, commodities, or things of value wherever situated." Tenn.Code Ann. § 47–18–103(9) (emphasis supplied).

**66.** *Black's Law Dictionary* (5th Ed.1979) defines "commodities" as "those things which are useful or serviceable, particularly articles of merchandise moveable in trade... Staples such as wool, cotton, etc. which are traded on a Commodity Exchange and on which there is trading in futures". *Black's* defines "futures contract" as "a present right to receive at future date a specific quantity of given commodity for fixed price" and as "commitments to buy or sell commodities at a specified time and place in the future."

trade from an equity run and no daily review of Ross' trading occurred while Ross was branch manager. (Tr. at 1372). In order to properly supervise the system trading, it would be necessary for the supervisor to know the opening range, the parameter, and price on the order ticket. Lacking any of these items of information, it is not possible to determine whether a system trade was properly taken. (Tr. at 1373). In short, Bradford was basically relying on Ross' representations in carrying out their supervisory duties with respect to Ross' trading.

Bradford's failure to supervise Ross is further demonstrated by continued trading in Cannon's account while the account was in a debit balance and/or under margin in violation of rules of Bradford and the exchanges. (Tr. at 1376).

Bradford failed to properly supervise Ross by failing to ascertain whether Cannon was using good funds. The record demonstrates that use of escrow checks did not constitute good funds. The record indicates that Cannon used escrow checks long before Ross became branch manager. Accordingly, it is clear that prior branch managers should have noticed the use of the escrow checks. The record indicates that copies of all deposits were kept at the branch office. The Court finds it significant that when Kitchen first became aware of the escrow checks, he immediately wanted verification as to the ownership of the underlying funds. This clearly demonstrates that the checks Bradford had accepted for several years were not proper checks in light of industry practice and custom.

In order to verify system use, it would have been necessary for Bradford and Cannon to know the opening range, the parameter, and how the market did on a particular day, in order to determine whether all systems trades were taken in accordance with the system. The record clearly reflects that Cannon lacked the information to verify that the system was being properly followed and relied upon by Ross and/or Norman to trade the system.

Dr. Teweles opined that Bradford did not adequately supervise Ross and Norman in the course of their trading in Mr. Cannon's account. (Tr. at 925). Teweles testified that Bradford should not have accepted real estate escrow account checks rather than speculate as to whether the money in the escrow account really belonged to Cannon and that Ross and Norman should have refused the escrow checks and insisted that Cannon provide them with a check drawn on his own account, or alternatively, document in writing that the money in the escrow account was Cannon's money and not related at all to his clients. Failing prompt receipt of such letter, the broker should not continue to accept escrow checks for an individual's account. (Tr. at 947–48). Bradford also failed to supervise Ross and Norman by allowing them to solicit customers' money in order to test the unproven system. (Tr. at 957–58).

Although Bradford contends that violation of its internal policy concerning good funds is not actionable since the rule is for Bradford's benefit, not Cannon's benefit [67], it is clear that the violation of this rule is evidence of Bradford's overall failure to supervise, Ross' intent to churn Cannon's account, and whether the acceptance of escrow checks was in good faith. Moreover, this conduct violated industry practice and custom without regard to whether Bradford had an internal policy on good funds. While the practice of requiring good funds benefits the FCM, it also operates to prevent blatant misuse of improper funds by dishonest customers, thus benefitting innocent third parties as well.

---

**67.** Weiner's report opined that evidence of Defendants' admitted failure to abide by in-house procedures is irrelevant, because internal rule violations cannot serve as the basis of an independent cause of action, citing *Osborn v. E.F. Hutton & Co., Inc.*, 853 F.2d 616, 619 (8th Cir. 1988). Regardless of whether violation of an internal rule creates a private action, Defendants' failure to abide by their own rules is probative and relevant evidence that Defendants defrauded Cannon, breached certain fiduciary duties to Cannon, and/or committed negligence in supervising the handling of Cannon's account, and that Bradford lacked good faith in accepting fraudulent transfers. *See Osborn*, 853 F.2d at 619 ("Although [plaintiff's] expert opined that the appellees had violated certain in-house rules, such a violation, *absent a showing of fraud*, does not provide a basis for liability." (emphasis supplied)).

Tennessee courts have long recognized the tort of negligent supervision. *See Hays v. Patton–Tully Transportation Co.*, 844 F.Supp. 1221 (W.D.Tenn.1993). This cause of action is brought mainly against employers or principals for the damages caused by their employees or agents. *Id.* Negligent supervision is not, however, founded solely on a *respondeat superior* theory; rather, it is an additional tort, allowing for independent recovery.[68]

It is undisputed that Bradford owed a duty to diligently supervise the discretionary trading conducted by Ross in Cannon's account. The record reflects that the supervision of Ross was superficial at best and was far from diligent. Bradford, who also benefitted substantially from the commissions charged to Cannon, permitted Ross to develop, market, and sell a system which had no reasonable basis, and for which it was not possible to supervise by reviewing the daily equity run. Bradford, in violation of its own rules, and in some cases those of the exchange, permitted Cannon to violate rules as to good funds by accepting real estate escrow account checks for years. Bradford also violated the rules by failing to investigate excessive losses and high commission to equity ratios, and Bradford condoned placing new trades while Cannon's account was either under margined or in a deficit balance. The failure to supervise proximately caused Cannon's losses. Had the system been properly tested and scrutinized, it is reasonable to infer that the system would not have been approved for use in Cannon's account, or, alternatively, that the required disclosures of risk would have been so onerous as to discourage use by Cannon. Had proper money management techniques been applied, Cannon would have been required to keep substantial equity in his account and to discontinue use of escrow checks. See *Harrison Agency, Inc. v. Pacific Mutual Life Ins. Co.*, 703 F.Supp. 441 (W.D.N.C.1989); *see also Smith v. Kmart Corp.*, 1996 WL 780490 (E.D.Wash.1996).

## XV. BREACH OF FIDUCIARY DUTY

An FCM stands in a fiduciary relationship with its client and has an affirmative duty of utmost good faith and is required to make full and fair disclosure of all material facts. *Commodity Futures Trading Com'n v. Savage*, 611 F.2d 270, 285 (9th Cir.1979); *Woods v. Reno Commodities, Inc.*, 600 F.Supp. 574 (D.C.Nev.1984). As a result of the discretionary trading authorization granted by Cannon to Ross and Norman, Ross and Norman became fiduciaries to Cannon. *Howell v. Freifeld*, 631 F.Supp. 1222 (S.D.N.Y.1986). The relationship between broker and investor is that of an agent to his principal. *See Griswold v. E.F. Hutton & Co., Inc.*, 622 F.Supp. 1397 (N.D.Ill.1985). The relationship is primarily fiduciary in nature, because it contemplates that the broker will hold and use the investor's money and other property. *Id.* Ross understood his fiduciary duty on a discretionary account to be his duty to help the customer "watch his money better". (Tr. at 218). Since Cannon entrusted Ross to trade his account, Ross had a duty to only recommend or place trades which had a reasonable basis and to disclose all material information to Cannon.

Contracts between parties to a fiduciary relationship are "especially vulnerable to attack" when the fiduciary has misrepresented a material fact, because for such contracts to be valid, they must be "open, fair and deliberately made". *Id.* at 1406. Breach of fiduciary duty becomes actionable under the CEA where the broker's conduct is reckless or intentional. *See Evanston Bank v. Conticommodity Services, Inc.*, 623 F.Supp. 1014 (N.D.Ill.1985); *McBlaine v. Jack Carl Associates, Inc.*, 705 F.Supp. 1340 (N.D.Ill.1989). Conduct is reckless if a broker acts in disregard of risk so obvious that the broker must be taken to have been aware of it and risk is so great as to make it highly probable that harm would follow. *Mayoza v. Heinold*

---

**68.** *Nichols v. Atnip*, 844 S.W.2d 655 (Tenn.Ct. App.1992), sets out four elements of negligent supervision:

  (1) A duty owed by the defendant to the plaintiff.

  (2) A breach of duty.

  (3) Injury or damage to the plaintiff.

  (4) A proximate causal relationship between the breach of duty and the injury.

*Id.* at 661; accord, *Gates v. McQuiddy Office Prods.*, No. 02A01–9410–CV–00240, 1995 WL 650128 (Tenn.App. Nov. 2, 1995).

*Commodities, Inc.,* 871 F.2d 672 (7th Cir. 1989).

While a broker need not have had a demonstrably evil motive or an affirmative intent to injure an investor, courts do look for at least knowing and deliberate conduct. *See Evanston Bank,* 623 F.Supp. at 1023. When such breach appears to be the product of the broker's intentional or reckless conduct and when its effect is to benefit the broker at the investor's expense, then courts will generally find such conduct violative of CEA § 4b. *Id.* If a broker is found liable for the breach of a fiduciary duty, the brokerage firm which employs him will also be liable. *See* 7 U.S.C. § 4; *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.,* 803 F.2d 454 (9th Cir.1986).

As a result of the fraudulent conduct described above, this Court finds that Ross breached his fiduciary duty to Cannon.

## XVI. FRAUDULENT CONVEYANCE– COUNT VIII

This Court previously granted partial summary judgment in favor of the Trustee and has concluded that the funds in Cannon's escrow accounts at United American Bank and First Tennessee Bank which were transferred to Bradford were property of the estate pursuant to 11 U.S.C. § 548. The remaining issues to be determined are whether the transfer of the funds by Cannon were made with intent to hinder, delay or defraud creditors and whether Bradford accepted the funds in good faith pursuant to § 548(c).[69]

### A. CANNON INTENDED TO HINDER, DELAY AND DEFRAUD

As a closing attorney, Cannon maintained several client escrow accounts to hold client funds in connection with real estate transactions. His principal real estate account was at United American Bank, although he also maintained an escrow account at First Tennessee Bank. The original purpose of these escrow accounts was to collect and disburse funds related to real estate closings. Cannon understood he was a fiduciary with respect to those funds and had a duty to disburse the

funds according to the disbursement tickets and settlement sheets. (Tr. at 990–91). It was Cannon's practice to disburse his legal fee generated in connection with the real estate closing by issuing a check drawn on the escrow account and depositing it to his law office operating account. (Tr. at 991–92).

By the mid–1980's, Cannon began to use the funds in his client escrow accounts to help fund some of his business ventures, including operating losses incurred in some of his businesses. For example, Cannon used approximately $200,000 to $300,000 of escrow funds to cover operating losses in Med Script, his medical transcription business. During 1986 through 1994, the volume of client funds going into Cannon's escrow accounts would range anywhere from $5,000,-000 to $10,000,000 per month. This volume of money would generate "float" which Cannon would utilize on a short term basis for his personal business interests. By the Fall of 1986, Cannon's real estate account had a net deficiency of approximately $400,000 to $500,000. It was possible to conceal his deficiency due to the large amount of float. (Tr. at 998–1000).

Between 1986 and 1994, Cannon's deficiency in his escrow account increased substantially. By the Spring of 1992, Cannon's deficiency had grown to approximately $1,500,000. By that point in time, Cannon continued to conceal any deficiency by the float in his account. As the deficiency increased, however, the float was insufficient to cover the deficiency and Cannon began to hold pay-off checks from closings in order to manage the deficiency. Initially, Cannon would hold a check for a week or so; however, as the deficiency increased in 1993 and 1994, Cannon would hold checks for longer periods of time. As Cannon was forced to hold checks, he became increasingly dependent upon new monies coming in from new closings in order to cover the checks which were being held on previous closings. During 1992 and 1993, there were occasions where the influx of new funds from new

---

**69.** The Trustee concedes that Bradford gave value within the meaning of § 548(c) by reason of § 548(d)(2)(B).

closings was insufficient to cover the checks which needed to be paid on the escrow account. As a result, Cannon would, from time to time, kite checks between accounts controlled by him in order to generate sufficient balances in his escrow to cover checks. The float created by the kites would be temporary and would ultimately be replaced by client funds from new closings. By February of 1994, the deficiency in Cannon's escrow account was over $3,500,000. (Tr. at 1001–1002).

By March of 1992, Cannon was looking for ways to try to make enough money to bring his escrow account current. When Ross called Cannon in the Spring of 1992 and told him that there were new opportunities to make money trading commodities, Cannon was "willing and anxious to do it". (Tr. at 1004).

Cannon did not disclose to his clients that he was using escrow funds to trade commodities and was not authorized to use client funds for this purpose. Cannon understood that his conduct was illegal and that he could go to jail if the deficiency in the account were ever discovered. (Tr. at 1008). Without client funds coming into the escrow account and without occasional float generated by kiting activities, checks written to Bradford would not have been honored. (Tr. at 1008–1009). When Cannon made payments to Bradford out of the escrow account, he expected to obtain money from new closings in order to pay off the closings which should have been paid with funds which went to Bradford. (Tr. at 1009). Cannon's use of the escrow account resembled a Ponzi scheme in that Cannon was dependent upon new client funds in order to pay off closings for prior clients. Cannon understood that the most recent clients were always at risk of loss in the event his law practice terminated. (Tr. at 1010).

By 1993 and 1994, Cannon had to work harder at his real estate practice in order to generate the level of closings needed to continue to conceal his escrow deficiency. Cannon benefitted from a refinancing boon and was concerned that a down turn in the real estate market would impair his ability to operate. (Tr. at 1012–1013). During this period of time, Cannon was also paying large amounts of interest on the closing loans which were not being promptly paid off by Cannon. (Tr. at 1013–14).

During late 1992 through February of 1994, the deficiency in Cannon's escrow account increased over $1,000,000 as a result of Cannon's commodity trading losses at Bradford. (Tr. at 1003; Trial Ex. 10). As a result, it became very difficult for Cannon to conceal the deficiency and Cannon was forced to rely upon holding greater numbers of pay off checks from closings and to kite more checks between his accounts. (Tr. at 1982).

In late 1993, after Cannon had sustained huge trading losses, Ross told Cannon that Bradford's management in Nashville wanted an explanation as to why escrow checks were being given and wanted confirmation that the money belonged to Cannon. Although Ross had knowingly accepted escrow checks for years, Ross requested a letter confirming that the funds in the account were Cannon's money. While Cannon verbally confirmed that the money belonged to him, Cannon never gave the written letter which was requested. Bradford never terminated trading in Cannon's account or refused to accept an escrow check because of Cannon's failure to provide the requested letter.

At the time Cannon filed for bankruptcy in February of 1994, the deficiency in his escrow account was approximately $3,500,000, which deficiency represented amounts that were owed to mortgage companies and individuals on real estate closings. (Tr. at 1210–11).

Jeffrey Graham, a CPA, retained by the plaintiff, prepared a source of funds analysis to determine the source of funds used to fund the escrow checks which were paid to Bradford by Cannon. The Record reflects that the checks drawn on Cannon's real estate escrow account at United American Bank and at First Tennessee Bank consisted of comingled pools of funds obtained from Cannon's clients in connection with real estate closing transactions and, on certain days, funds generated by Cannon as a result of a check kiting scheme between various bank

accounts controlled by Cannon. A smaller portion of the co-mingled funds came from Cannon's office operating account, which was the account where Cannon deposited his legitimate fee income. (Trial Ex. 10.)

During the year prior to bankruptcy, Cannon wrote checks totaling $1,137,500 from his escrow accounts at UAB and First Tennessee in order to cover his margin calls and continue to trade commodities. (Tr. at 1007; Trial Ex. 10). These checks were paid out of a pool of deposits aggregating $11,997,187.20. Out of this total pool of deposits, $9,982,928.00 were funds from real estate closings; $1,091,499.42 of deposits were attributable to kites; $743,291.95 were attributable to other Cannon accounts, which Cannon later identified as kites; [70] and approximately $103,204.00 were funds from unidentified sources.

In *In re M & L Business Machine Co., Inc.*, 198 B.R. 800 (D.Colo.), *aff'd*, 84 F.3d 1330 (10th Cir.1996), the bankruptcy court held that payments made to investors in the furtherance of a Ponzi scheme were made with the actual intent to hinder, delay or defraud under § 548(a)(1). The court rejected the argument that the trustee was required to establish that the payment to the transferee was made with the **specific** intent to hinder, delay or defraud. The district court affirmed this ruling, stating that the debtor's involvement in a Ponzi scheme established the requisite intent to hinder, delay, or defraud. 160 B.R. at 857. The court adopted the following reasoning from *Merrill v. Abbott (In re Independent Clearing House Co.)*, 77 B.R. 843 (D.Utah 1987), stating:

> To be fraudulent under § 548(a)(1), a transfer need not be made with the intent to hinder, delay or defraud the transferee. The trustee need only show that the transfers were made with the intent to hinder, delay or defraud 'any entity to which the debtor was or became [indebted], or after the date that said transfer occurred.' 11 U.S.C. § 548(a)(1) (emphasis added). The persons who invest on the eve of a Ponzi scheme's collapse are entities to whom the debtor becomes indebted when they en-

trust their money to the debtors. Therefore, if at the time the debtors made transfers to earlier undertakers, they had actual intent to hinder, delay or defraud later undertakers, transfers to earlier undertakers may be fraudulent within the meaning of § 548(a)(1).

> One can infer an intent to defraud future undertakers from the mere fact that a debtor was running a Ponzi scheme. Indeed no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a certainty constitutes intent in the eyes of the law, cf. Restatement (2nd) of Torts 8(a) (1963, 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them.

77 B.R. at 860.

While it is arguable that Cannon was not engaged in a "classic" Ponzi scheme, his scheme to misappropriate escrow account funds was similar in many respects. For years Cannon concealed his misuse of funds by using funds obtained to close subsequent real estate transactions to pay off earlier real estate closings, the loan proceeds of which had been misappropriated by Cannon. Cannon admitted that his ever increasing need to bring in new funds was similar to a Ponzi scheme. Cannon knew that if he could not sustain the concealment, his fraud would be discovered and that the last group of clients would be left with nothing.

Cannon admits that he misused and misappropriated closing funds for other than a proper purpose. Cannon also testified that he understood that when he used client funds

---

**70.** The checks deposited between Cannon's related accounts which Graham was unable to definitively identify as kiting checks, were confirmed

to be check kites by Cannon. (Tr. at 1075; Trial Ex. 51).

out of the escrow account to make payments to J.C. Bradford, he was using money which did not actually belong to him. Cannon was indicted by the federal government for criminal acts arising out of his misappropriation of funds from the escrow account. Cannon pled guilty to these charges. (Trial Ex. 16).

■ Cannon's testimony coupled with his guilty plea concerning misappropriations out of his client trust account demonstrates that Cannon had the requisite fraudulent intent under § 548(a)(1) with respect to the transfers at issue. *See e.g., In re Mark Benskin and Company, Inc.,* 161 B.R. 644 (Bankr.W.D.Tenn.1993)(Debtor's intent to defraud creditors established by guilty pleas to related criminal charges); *See also In re Randy,* 189 B.R. 425 (Bankr.N.D.Ill.1995); *In re Hicks,* 176 B.R. 466, 472 (Bankr. W.D.Tenn.1995)(Guilty plea to perjury charges relating to transfer evidences intent to defraud).

■ "[T]he finding of the requisite intent may be predicated upon the concurrence of facts which, while not direct evidence of actual intent, lead to the irresistible conclusion that the transferor's conduct was motivated by such intent." 4 *Collier on Bankruptcy* ¶ 548.02[5], at 548–33–34 (15th ed.1983). It has also been found that a "clear pattern of purposeful conduct will support a finding of actual intent to defraud." *In re Checkmate Stereo & Electronics, Ltd.,* 9 B.R. 585, 612–13. In *In re Bell & Beckwith,* 64 B.R. 620, 629 (Bankr.N.D.Ohio 1986), the court found intent to defraud under similar facts. In *Bell,* the debtor's deposition testimony, his conviction, and the evidence presented at trial showed that he misused client funds. The court found that although the funds were not spent with the intent to defraud his customers, the use and availability of the funds "was accomplished by and is the product of a deliberate fraud." *Id.* Further, the court held that any disposition of those funds must be considered to be part of a continuing course of conduct intended to defraud the customers of the debtor, and thus, the requisite showing of fraudulent intent was present. *Id.* In the present case, Cannon's admitted conduct of using client escrow funds for unauthorized purposes in breach of his fiduciary duty, combined with his check kiting activities to conceal the fraud and his guilty plea, demonstrates his fraudulent intent through a "clear pattern of purposeful conduct."

It cannot be seriously disputed that Cannon's creditors were defrauded as a result of the transfers to Bradford or that Cannon had the requisite intent to defraud. Cannon would not have been in a position to make any payments to Bradford without misappropriating client funds or, alternatively, engaging in fraudulent kiting activities. Accordingly, Cannon's transfer of $1,137,500 to Bradford was made with intent to hinder, delay, and defraud existing and future creditors of Cannon.

## B. BRADFORD DID NOT RECEIVE THE TRANSFERS IN GOOD FAITH

11 U.S.C. § 548(c) provides:

Except to the extent that a transfer or obligation voidable under this section is voidable under § 544, 545, or 547 of this Title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

Congress, in § 548(c), did not define the term "good faith". Courts applying § 548(c) have avoided specific definitions of what constitutes good faith, and have tended to render fact-specific decisions. *See, e.g., In re Agricultural Research and Technology Group, Inc.,* 916 F.2d 528, 536 (9th Cir.1990) (courts have been candid in acknowledging that good faith is not susceptible of precise definition); *In re Roco Corp.,* 701 F.2d 978, 984 (1st Cir.1983) (good faith not susceptible of precise definition); *In re Sherman,* 67 F.3d 1348 (8th Cir.1995) (good faith determined *ad hoc* on case-by-case basis). Courts have generally held that it is not necessary to show that the transferee had actual fraudulent intent, though fraudulent intent on the

part of the transferee would clearly establish the lack of good faith.

Some courts have held that in order for a fraudulent transfer to have been received in good faith, the transaction must bear the earmarks of arms-length bargain. *See, e.g., In re Independent Clearing House Co.,* 77 B.R. 843 (D.Utah 1987). Other courts have stated the test as whether a reasonably prudent person in the position of the transferee should have known of the debtor's fraudulent intent and impending insolvency. *See, e.g., In re M & L Business Machine Co., Inc.,* 198 B.R. 800 (D.Colo.), *aff'd,* 84 F.3d 1330 (10th Cir.1996).

Good faith is to be measured objectively, rather than subjectively. Consequently, a transferee may not put on "blinders" prior to entering into transactions with the debtor and claim the benefit of § 548(c), where circumstances would place the transferee on inquiry notice of the debtor's fraudulent purpose or insolvency. *See M & L Business Machine,* 84 F.3d at 1338 (good faith should be measured objectively); *Brown v. Third National Bank,* 67 F.3d 1348, 1355 (8th Cir.1995); *In re Sherman,* 67 F.3d 1348 (8th Cir.1995) (courts look to what the transferee should have known instead of examining transferee's actual subjective knowledge); *In re Maddalena,* 176 B.R. 551 (Bankr.C.D.Cal.1995) (one who knowingly or recklessly participates in a fraudulent scheme designed to injure or obstruct the transferor's creditors will not be protected even though value is given).

Courts have found good faith lacking in a wide variety of circumstances. For example, courts have frequently held that mere knowledge by the transferee of the debtor's insolvency is sufficient to negate good faith. *In re Sherman,* 67 F.3d 1348 (8th Cir.1995) (not good faith when transferee has sufficient knowledge to place him on inquiry notice of debtor's possible insolvency); *In re Allied Development Corp.,* 435 F.2d 372 (7th Cir.1970) (knowledge of lender's assignees who accepted assignment without inquiry into circumstances of assignment and with knowledge of debtor's irregular conduct constituted lack of good faith); *In re Health Gourmet, Inc.,* 29 B.R. 673 (Bankr.D.Mass.

1983) (lender's knowledge of borrower's insolvency prohibits a finding of good faith transferee); *Matter of Fitzpatrick,* 73 B.R. 655 (Bankr.W.D.Mo.1985) (transferee knew or should have known the debtor's financial distress which was sufficient to dispel finding of good faith); *In re Terrific Seafoods, Inc.,* 197 B.R. 724 (Bankr.D.Mass.1996) (lender's knowledge of debtor's insolvency rendered transfer not in good faith).

Other courts have found lack of good faith in the transferree's actual conduct. *In re Reaves,* 8 B.R. 177 (Bankr.D.S.D.1981) (where creditor coerced debtor into executing third mortgage, the creditor was not good faith transferee); *In re Baker and Getty Financial Services, Inc.,* 98 B.R. 300 (Bankr.N.D.Ohio 1989) (lender's receipt of the debtor's funds to pay affiliates debt was not in good faith where bank failed to conduct adequate title search and credit investigation of a third party and was aware of debtor's involvement on Ponzi scheme); *Roco Corp.,* 701 F.2d 978 (payments to sole shareholder for redemption of shares in insolvent debtor corporation was not in good faith).

Courts have found mere failure to inquire in the face of unusual circumstances to be sufficient. In *M & L Business Machine,* 84 F.3d 1330, the Tenth Circuit upheld the bankruptcy court's findings that payments to a Ponzi scheme investor were not made in good faith. The court of appeals concluded that a reasonably prudent investor in the defendant's position should have known of the debtor's fraudulent intent and impending insolvency based on the extraordinary rate of returns promised, the use of postdated checks, and implausible explanations as to how the debtor could pay such high rates. In addressing the standard of good faith, the court noted that the Bankruptcy Code does not define the term "good faith" and, citing *Collier,* that "[t]he unpredictable circumstances in which the courts may find its presence or absence render any definition of 'good faith' inadequate, if not unwise." 84 F.3d at 1335. The Tenth Circuit further stated:

> Nevertheless, contrary to Mr. McKay's contention 'good faith' has frequently been construed to include an objective compo-

nent. After noting that '[g]ood faith is an intangible and abstract quantity with no technical meaning,' *Black's Law Dictionary* states that the term includes not only *'honest belief, and absence of malice and the absence of design to defraud or to seek an unconscionable advantage'* but also *'freedom from knowledge of circumstances which ought to put the holder on inquiry.'* *Black's Law Dictionary* at 693 (6th ed.1990) (emphasis supplied). Prominent bankruptcy scholars agree: '[t]he presence of any circumstances placing the transferee on inquiry as to the financial condition of the transferor may be a contributing factor in depriving the former of any claimed good faith unless investigation actually disclosed no reason to suspect financial embarrassment.' 4 *Collier on Bankruptcy, supra,* § 548.07 at 548–73.

*M & L Business Machine,* 84 F.3d at 1335–36.

In *In re Cohen,* 199 B.R. 709 (9th Cir. BAP 1996), the court held that:

One lacks the good faith that is essential to the U.F.T.A. § 8(a) defense to avoidability if possessed with enough knowledge of the actual facts to induce a reasonable person to inquire further about the transaction. U.F.T.A. § 8(a), comment (2) knowing facts rendering transfer avoidable 'will be inconsistent with the good faith that is required of a protected transferee'. Such inquiry notice suffices on the rationale that some facts suggest the presence of others to which a transferee may not safely turn a blind eye.

In *HBE Leasing Corp. v. Frank,* 48 F.3d 623 (2d Cir.1995), the court, construing the UFCA, held:

"[C]onstructive knowledge of fraudulent schemes will be attributed to transferees who were aware of circumstances that should have led them to inquire further into the circumstances of the transaction, but who failed to make such inquiry... [citations omitted]. There is some ambiguity as to the precise test for constructive knowledge in this context. While some cases have stated that purchasers who do not make appropriate inquiries are charged with 'the knowledge that ordinary diligence would have elicited' ... [citations omitted], others appear to have required a more active avoidance of the truth, ... [citations omitted]".

48 F.3d at 636.

■ The record reflects that Bradford defrauded Cannon in connection with the trading in his account. By fraudulently inducing Cannon to trade, failing to disclose material information, and churning Cannon's account, the Record reflects that Bradford did not accept the transfers from Cannon's escrow account with an absence of malice and absence of design to defraud. Even if Bradford's intentional wrongdoing is ignored, it is clear that Bradford did not act in good faith when measured by objective standards where the record shows that:

(a) Bradford knowingly accepted escrow checks for a period of years.

(b) Ross and Norman discussed the fact that their largest customer was giving them escrow checks and concluded that Cannon must be commingling his funds with his clients, even though Ross was aware that Bradford could not commingle its funds with trust funds.

(c) Cannon bounced checks on his escrow account and occasionally wrote real estate descriptions on the check which were totally unrelated to his commodity account.

(d) Bradford had an internal policy which required that the name on the check match the name on the account and which prohibited acceptance of fiduciary checks for individual accounts.

(e) Acceptance of an attorney's escrow check for the attorney's personal account without written representation of ownership violates industry practice.

(f) Kitchen immediately questioned the ownership of funds in the account when he finally discovered their use and demanded written verification of Cannon's ownership.

(g) Cannon continued to meet margin calls with escrow checks, after he had suffered huge losses which were excessive in relation to his stated income, net worth and liquid assets.

(h) After sustaining significant losses, Cannon solicited Ross to make a loan to one of Cannon's companies while offering exorbitant interest rates.

The Record reflects that Ross turned a blind eye to facts which would have caused a reasonably prudent broker to refuse to accept escrow checks and cease trading under the circumstances of this case. For the foregoing reasons, the Court finds that Bradford did not accept Cannon's real estate escrow checks in good faith.

## XVII. DAMAGES

### A. DAMAGES FOR COMMODITIES FRAUD UNDER CEA §§ 4b & 4o

Section 22(a) of the CEA, 7 U.S.C. § 25(a), limits damages to private litigants bringing claims under the CEA to "actual damages" only. Courts have wrestled with the term "actual damages" often, but not in the commodities trading realm.[71]

In *Randall v. Loftsgaarden*, 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986), a securities fraud case, the Supreme Court analyzed the different measures of recovery of "actual damages" for fraud, primarily including rescission and restitution. *See* 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525. The *Randall* Court concluded that, although § 28(a), and § 17(a) of the SEA did not allow an award of punitive damages in private rights of action, Congress intended to deter wrongdoers, and hence, that wide latitude in choosing the measure of damages was warranted. *See id.* at 664, 106 S.Ct. 3143 (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972)). The *Randall* Court continued by holding that:

> *This deterrent purpose is ill-served by a too rigid insistence on limiting plaintiffs to recovery of their "net economic loss."*

*Id.* (emphasis added) (citing *Salcer v. Envicon Equities Corp.*, 744 F.2d 935, 940 (2nd Cir.1984)).

The *Randall* Court ultimately allowed the defrauded investor to recover all of his capital investment under a rescission theory, while retaining certain prior tax benefits incident to his investment, *id.* at 667, 106 S.Ct. 3143, because "[i]t is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them." *Id.* (quoting *Janigan v. Taylor*, 344 F.2d 781, 786 (1st Cir.), *cert. denied*, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965)); *accord Nelson v. Serwold*, 576 F.2d 1332, 1339 (9th Cir.) (allowing recovery based on fraud-feasor's profit which was 10 times greater than it would be based on fraud-victim's loss), *cert. denied*, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978); *Rude v. Cambell Square, Inc.*, 411 F.Supp. 1040, 1050 (D.S.D.1976) (awarding plaintiff gains attributable to "natural commercial growth and the windfall in commercial development").

In *Kane v. Shearson Lehman Hutton, Inc.*, 916 F.2d 643 (11th Cir.1990), the plaintiff sought damages for the violation of the antifraud provisions of federal and state securities laws. In sustaining a damages award under state securities law, the Eleventh Circuit, applying *Randall*, held that the plaintiff was entitled to recovery of all his damages on a stock, *without netting out earlier profits. See id.* at 646. The court reasoned that if it were to allow the defendant to net out prior gains from the damage calculation, *"it could serve as a license for broker-dealers to defraud customers with impunity up to the point where losses equaled prior gains." Id.* (emphasis supplied).

Recovery of gross trading losses for commodities fraud predates Kane. *See Kuhland v. Lincolnwood, Inc.*, 1986 WL 65629, at \*12, [1986–1987 Transfer Binder] Comm. Fut. L. Rep. ¶ 22,994, at 31,943 (CFTC 1986) (award of gross trading losses appropriate without offset of profitable trades); *DeAngelis v. Shearson/American Express, Inc.*, 1984 WL 47628 at \*4, [1984–1986 Transfer Binder] Comm. Fut. L. Rep. ¶ 22,753, at 31,139 (CFTC 1985), aff'd 1985 WL 56348 (exposure to greater risks may warrant award of market losses); *Gatens v. International Precious Metals Corp.*, 1985 WL 55298, at \*9, [1984–

---

**71.** Because CEA § 22(c) tracks the language of section 28(a) of the Securities Exchange Act of 1934 ("SEA"), 15 U.S.C. § 78a, *et seq.*, cases dealing with securities fraud provide direction.

1986 Transfer Binder] Comm. Fut. L. Rep. ¶ 22,636, at 30,702 (CFTC 1985) (damages calculations are not strictly limited to customers' net investments).

In *Kuhland v. Lincolnwood, Inc.*, a reparations proceeding, the Kuhlands invested $60,000 with Lincolnwood and broker Havens. After a short period of heavy trading activity and losses, the Kuhlands closed their account and had $30,305 returned to them. This amount included $9,150 in profitable trades and sustained gross trading losses of $38,945. The CFTC found that Kuhland had been induced to open his account based on material misrepresentations that the broker would adhere strictly to a trading system described in promotional literature, that the broker had departed from that strategy, and had churned the account as evidenced by high commission to equity ratio, excessive day trades, and trading while under margined. *Kuhland, supra,* at 31,944–31,948. The Kuhlands' net trading losses were $29,795 ($38945–$9,150). The ALJ awarded the Kuhlands $38,945, which represented their gross trading losses, **with no offset for profitable trades.** *Id.* at 31,949.[72] The Court finds that the facts in the case at bar merit the same manner of compensatory damages calculation as in *Kuhland, supra.*[73]

The intent of Congress in the enactment of federal anti-fraud provisions relating to the securities exchange, and the commodities exchange, was two-fold: (1) to restore the aggrieved investor to the *status quo*, and (2) to deter the malfeasor and others in the industry from similar conduct in the future. *See Randall,* 478 U.S. at 664, 106 S.Ct. 3143. The fraud perpetrated by Defendants was systematic, continuous, and pervasive. Because he relied upon Defendants' misrepresentations for so long, and staked so much on their promises, Cannon's true compensatory damages are not accurately represented by his "net economic loss", but rather, by

$2,361,736, the gross losses in his account from March 1992 until February, 1994.

## B. DAMAGES FOR COMMON LAW FRAUD

"When a federal securities claim overlaps with a pendant state law claim, the plaintiff is entitled to the maximum amount recoverable under any claim." *Grogan v. Garner,* 806 F.2d 829, 839 (8th Cir.1986). The clear intent of the Supreme Court in *Randall* and *Affiliated Ute Citizens, supra,* evinces an intent to ensure that a defrauded investor in any market not be deprived of the right to recover all of his damages. *Cf.* 478 U.S. at 661–62, 106 S.Ct. 3143.

In Tennessee, courts generally award a fraud victim the benefit of his bargain under the expectancy theory. *See, e.g., Haynes v. Cumberland Builders, Inc.,* 546 S.W.2d 228 (Tenn.App.1976). Under this general rule, the Court awards Plaintiff the difference between the value of that which the Plaintiff actually received and the value of that which he would have received had the Defendants' misrepresentations been true. See id.; Accord, *Youngblood v. Wall,* 815 S.W.2d 512 (Tenn.App.1991).

Ross and Bradford falsely represented to Cannon that the system reduced risk, minimized losses, and that, over time, trading profits would outweigh trading losses. Cannon reasonably believed that, if he traded the system with "iron discipline", the money he invested with Defendants would generate a positive return. Ross also induced Cannon to trade spreads under Ross' direction based on trading recommendations that had no reasonable basis. Between March 1992 and February 1994, Cannon lost substantial sums of money but continued to trade based on representations that the system could recover the losses by continued trading when there was no reasonable basis for making such a representation. Moreover, since Ross

---

72. Additionally, the Kuhlands were awarded prejudgment interest, commencing at the end of their trading relationship with the respondents. *Id.* at 31,951.

73. But see *Minpeco S.A. v. Conticommodity Servs., Inc.,* 676 F.Supp. 486 (S.D.N.Y.1987)(no showing that defendants would be unjustly en-

riched or escape appreciable liability by allowing offsetting); *Apex Oil Co. v. DiMauro,* 744 F.Supp. 53 (S.D.N.Y.1990) (similar reasoning). These cases, however, depart from the reasoning of the Supreme Court in *Randall* and *Affiliated Ute Citizens,* and should in any event be distinguished from the present case by dissimilar facts.

was acting as a CTA, he should have provided Cannon with a disclosure statement when Cannon resumed trading in 1992. Had Ross done so, he would have been forced to disclose the system's failure in numerous markets and his actual track record as a spread trader to Cannon.

The difference between the value of what Cannon actually received (-$1,046,489) and that which he was promised (at the very least, a positive number), is necessarily greater than the amount of his net economic loss. To award Cannon's estate only net trading losses would be to ignore Ross' and Bradford's promises to Cannon that if he "took every trade" and exercised "iron discipline", system gains would eventually outweigh system losses. Although it was never guaranteed that Cannon would not suffer any losses, it was represented that over time, the system provided excellent chances for realizing substantial profits. Cannon's gross trading losses more appropriately reflect what Cannon should have received had Ross' and Bradford's representations to him not been fraudulent. In other words, this figure represents the most certain numerical value of what was promised Cannon, and what he should have received had those promises been true.

To allow Defendants to offset gains from successful trades would unjustly enrich them because they have already received at least one benefit, in addition to commissions, as a result of the trading in Cannon' account. The gains in Cannon's account were not withdrawn but were reinvested into Cannon's account. As Kitchen himself acknowledged at trial:

> If you look at our annual P and L, *we make the float on the customer balances,* or said another way, our income, regardless of how you look at it, roughly equates year over year to the interest earned on the customer balances.

(Tr. at 2044, ll.3–8.)

Netting out these gains now, after Defendants have already profited by them, would be contrary to the Supreme Court's pronouncement in *Randall. Cf.* 478 U.S. at 663, 106 S.Ct. 3143 ("[I]t would be more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them.").

## C. DAMAGES FOR CHURNING, AND UNDER COMMON LAW THEORIES OF FRAUD AND BREACH OF FIDUCIARY DUTY

The CFTC generally awards two types of damages in proven churning cases: (1) commissions and fees charged the customer and (2) the customer's trading losses. *See Lehman v. Madda Trading Co.,* [1984–1986 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 22,417, at 29,869–29,871 (CFTC 1984) (commissions and associated direct charges); *Bjelde v. Commonwealth Commodities Corp.,* [1984–1986 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 22,960, at 31,798 (CFTC 1986) (trading losses based on fraudulent inducement). Generally, though, absent certain conditions, *see infra,* the first measure of damages is applied. *See ibid.* The total commissions and fees debited from Cannon's account—$281,876—is the proper amount to award under this first approach.

## D. DAMAGES FOR COMMON LAW TORTS OF NEGLIGENCE AND NEGLIGENT SUPERVISION

While the gravamen of the complaint asserts a claim for fraud, the Trustee also seeks recovery for negligent supervision. There is no mathematical formula for computing damages in negligence cases. *See Smith v. Bullington,* 499 S.W.2d 649, 661 (Tenn.App.1973) (citing *Templeton v. Quarles,* 52 Tenn.App. 419, 374 S.W.2d 654 (1963)). As the Tennessee Supreme Court stated in *Western Union Tel. Co. v. Potts,* 113 S.W. 789, 120 Tenn. 37 (Tenn.1908), a case involving an important telegram which was not delivered properly:

> The measure of damages, whether the suit be on the contract or in tort, is, in this class of cases substantially the same, *viz.:* **(1) If there has been a violation of the contract, or a breach of duty on the part of the company, the aggrieved party is entitled to recover, in any event, nominal damages.** [citations omitted]... *(2) Such damages as may be fairly and reasonably considered as arising naturally,*

*in the usual course of things, from the breach of the contract or the violation of public duty, or such damages as may be reasonably supposed to have been within the contemplation of both parties, at the time they made the contract, as the probable result of a breach of it.* [citations omitted] *(3) In a proper case, punitive damages.* [citations omitted]

113 S.W. at 790–91.

Since there is no comprehensive list of remedies for a negligence claim, courts often tailor damages to the particular facts of the case. For example, in an action against a commodities broker in the unauthorized cover of a short sale, the court chose the difference between the price at which the commodity was bought without authorization and the lowest market price within a reasonable time after such cover as the proper measure of compensatory damages. *See Dean Witter and Co., Inc. v. Tiger Tail Farms, Inc.*, 674 S.W.2d 699 (Tenn.1984).

In one such case, *Holmes v. Wheat Investment Advisors, Inc.*, 1987 WL 103535, at *19, *29, [1987] Comm. Fut. L. Rep. (CCH), ¶ 23,-653, the court decided that the proper measure of damages where the broker had failed to institute proper loss control procedures was the amount of money the aggrieved investor's portfolio would have been worth had the broker set up proper loss control procedures as promised. *Id.* at 33,699–33,702. The Court finds that it is proper to award damages for negligence in accordance with *Holmes, supra,* awarding the value of what Cannon should have received had Ross and Bradford not behaved negligently with respect to their duties to him. Damages in the amount of Cannon's gross trading losses are consistent with the foregoing in at least two respects: (1) Cannon's potential for gross trading losses of $2,361,736 was reasonably foreseeable and probable as a result of the prior system failures and Ross' lack of expertise in trading spreads at the time Cannon reinstituted trading in 1990, *cf. Potts, supra;* and (2) had Bradford properly supervised Cannon's account, then the trading in Cannon's account would probably have suffered far fewer of the losses which offset Cannon's gains and wiped out his prior earnings but

put him $1,046,489 in debit. *Cf. Holmes, supra.*

### E. DAMAGE REMEDIES AVAILABLE UNDER THE TENNESSEE CONSUMER PROTECTION ACT

Under the TCPA, the plaintiff is normally limited to actual damages, but treble damages also may be awarded if the violation was willful or knowing. *See Smith v. Scott Lewis Chevrolet, Inc.*, 843 S.W.2d 9 (Tenn.App. 1992). Attorney's fees may also be awarded to the prevailing plaintiff, in the exercise of the Court's discretion. T.C.A. § 47–18–109(e)(1).

The TCPA is a remedial statute. *See Smith v. Scott Lewis Chevrolet, supra.* In addition to actual damages, the TCPA allows the Court to grant whatever relief it determines to be necessary and proper, to restore the aggrieved and to punish and deter the wrongdoer. *See id.* Rescission of a contract made as a result of an unfair or deceptive trade practice is a proper remedy available under the Act. *Cf. id.*

Under these measures of damages, the Court awards the Trustee Cannon's gross trading losses of $2,361,736 plus attorneys fees and expenses. The Court does not find that treble damages are appropriate in this case because of the Court's decision regarding punitive damages.

### F. PUNITIVE DAMAGES UNDER STATE LAW THEORIES OF FRAUD AND BREACH OF FIDUCIARY DUTY

The "actual damages" provision of CEA § 22(a), 7 U.S.C. § 25(a), does not preempt an award of punitive damages under a state statutory or common law theory. *See Khalid Bin Talal Etc. v. E.F. Hutton & Co.*, 720 F.Supp. 671 (N.D.Ill.1989); *accord Grogan,* 806 F.2d at 839 ("When a federal securities claim overlaps with a pendant state law claim, the plaintiff is entitled to the maximum amount recoverable under any claim.").

In Tennessee, punitive damages may be awarded in cases involving common law fraud, *see First Nat'l Bank of Louisville v. Brooks Farms ("Brooks Farms"),* 821

S.W.2d 925, 927 (Tenn.1991), or breach of fiduciary duty. *See Pridemore v. Cherry*, 903 S.W.2d 705, 709 (Tenn.App.1995); *accord Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn.1992) (court may award punitive damages if it finds defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly).

In determining the proper amount of punitive damages to award, Tennessee courts consider the following non-exhaustive factors:

(1) The defendant's financial affairs, financial condition, and net worth;

(2) The nature and reprehensibility of defendant's wrongdoing, including impact on the plaintiff and defendant's relationship with plaintiff;

(3) The defendant's awareness of the amount of harm being caused and defendant's motivation in causing the harm;

(4) The duration of defendant's misconduct and whether defendant attempted to conceal the conduct;

(5) The expense plaintiff has borne in the attempt to recover the losses;

(6) Whether defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior;

(7) Whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act;

(8) Whether, once the misconduct become known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and

(9) Any other circumstances shown by the evidence that bear on determining the proper amount of the punitive award.

*Hodges*, 833 S.W.2d at 901–02.

The purpose of awarding punitive damages is to punish the defendant and to deter both the defendant and others from engaging in similar conduct in the future. *See Brooks Farms*, 821 S.W.2d at 927 (citing *Cumber-*

*land Telephone and Tel. Co. v. Shaw*, 102 Tenn. 313, 318, 52 S.W. 163 (1899) ("Where fraud ... intervenes the law blends the interests of society and of the aggrieved individual and gives damages such as will operate as an example or warning to the parties or to others to deter.")); *see also Kerr v. First Commodity Corp. of Boston*, 735 F.2d 281 (8th Cir.1984).

In determining the proper penalty for commodities fraud in regulatory actions against CTAs, in particular, the CFTC considers factors such as the CTA's net worth and the gravity of the violation. *See JCC, Inc. v. Commodity Futures Trading Commission*, 63 F.3d 1557 (11th Cir.1995). In so doing, the CFTC has indicated that a fair consideration of these factors:

> ... *should ordinarily result in a civil penalty that does not exceed a respondent's net worth, yet deters future violations by making it beneficial financially to comply with the requirements of the Act and Commission regulations rather than risk violations.*

*JCC, Inc.*, 63 F.3d at 1570–1571 (emphasis supplied); *accord Kerr*, 735 F.2d at 289 (degree of willfulness and malice involved in the perpetration of the fraud, as well as the defendant's financial circumstances, are relevant factors in determining the proper amount of punitive damages to award on a common law fraud claim).

The United States Supreme Court has recently authored three opinions giving valuable guidance in the area of punitive damage awards—*Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), *TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), and *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). In Pacific Mutual, the Court held among other things that a punitive damages award of over 4 times the amount of compensatory damages *did not* "cross the line into the area of constitutional impropriety" under a due process challenge. 499 U.S. at 23–24, 111 S.Ct. 1032.[74] Following *Pacific Mutual*, the *TXO*

---

**74.** The *Pacific Mutual* Court upheld a punitive     award which was 200 times the amount of the

Court directed that the trial court inquire "whether there is a reasonable relationship between the punitive damages award and the harm *likely to result* from the defendant's conduct as well as the harm that actually has occurred." 509 U.S. at 460, 113 S.Ct. 2711. The *TXO* Court found that a punitive judgment in the amount of $10,000,000, based upon **potential harm** of not less than $1,000,-000 was constitutionally permissible. *Id.* at 462, 113 S.Ct. 2711. Compared to the actual compensatory award in *TXO*—$19,000—the $10,000,000 punitive assessment yielded a ratio of 526–1. Finally, in *BMW v. Gore,* the Court reversed an award of punitive damages award which was 500 times greater than were the underlying compensatory damages.[75] 517 U.S. at 586, 116 S.Ct. 1589.

Under *Hodges'* 9–point analysis, *supra,* 833 S.W.2d at 901–02, the defendant's financial condition and net worth factor heavily into the calculation of any punitive damages award. *See id.;* see also *JCC, Inc.,* 63 F.3d at 1570–1571; *Kerr,* 735 F.2d at 289. The proof demonstrates that Bradford has a net worth through June 30, 1997 of $168,875,000. *See* Tr. Ex. 41; Tr. at 2103. A company with a net worth of approximately $168 Million is only going to feel the deterrent effect of a significant award of punitive damages. *Cf. JCC, Inc.,* 63 F.3d at 1570–1571.

Ross and Bradford's conduct was willful, fraudulent, and totally unacceptable to society. While the present case only seeks to recover Cannon's losses, it is manifest that other customers who traded the system suffered similar losses while Bradford benefitted from their trading. (Trial Ex. 7).

The Court assesses against Defendants punitive damages of five million ($5,000,000) dollars for the systematic and pervasive fraud they practiced upon Cannon and for the breach of their duties, fiduciary and oth-

erwise, to Cannon and to the public in general.[76]

## G. DAMAGES FOR FRAUDULENT TRANSFERS UNDER 11 U.S.C. § 548—COUNT VIII

Pursuant to 11 U.S.C. § 550, the Trustee is seeking to recover the value of the fraudulent transfers made to Bradford during the one year period prior to bankruptcy, or $1,137,500. This sought for recovery is in addition the damages to which the Trustee is entitled to under Counts I through VII.

■ When asserting his avoidance powers, the trustee is not asserting a cause of action belonging to the debtor, but is acting in a representative capacity on behalf of all the creditors. *In re Independent Clearing House, Co.,* 41 B.R. 985 (Bankr.D.Utah 1984); *In re Leasing Consultants, Inc.,* 592 F.2d 103, 110 (2d Cir.1979). Accordingly, while the Trustee may assert all causes of action which Cannon could have asserted but for the intervention of bankruptcy, the Trustee also has the right to assert avoidance actions for the benefit of unsecured creditors. The trustee's CEA and state law claims seek redress for damages sustained by Cannon as a result of Ross and Bradford's fraudulent conduct and breach of duty. The trustee's § 548 claim, by contrast, seeks redress for damages sustained by Cannon's unsecured creditors as a result of Cannon's transfer of property with intent to hinder, delay and defraud his creditors.

■ It is clear that, in the absence of bankruptcy, Cannon could have asserted Counts I through VII against Bradford and Ross in one lawsuit, while Cannon's creditors could have asserted a fraudulent conveyance claim against Bradford under state law for the misappropriation of funds from Cannon's escrow account. The outcome on one suit would in no way be dependent upon the

---

out-of-pocket expenses suffered by the plaintiff in that case. *See* 499 U.S. at 23, 111 S.Ct. 1032.

75. The punitive assessment of $2,000,000 was awarded fraudulent concealment of scratches on a new ($40,000) car purchased by Dr. Gore. At trial, the jury determined that the cost of a new paint job was $4,000. *See id.* at 562–65, 111 S.Ct. 1032.

76. *Jordan v. Clayton Brokerage Co. of St. Louis,* 861 F.2d 172, (8th Cir.1988), appeal after remand, 975 F.2d 539 (8th Cir.1992), cert. Denied, 507 U.S. 916, 113 S.Ct. 1272, 122 L.Ed.2d 667 (1993) (upholding punitive assessment of $400,000 on compensatory damages of $7,924—a ratio in excess of 50–1).

outcome of the other. Moreover, the measure of damages under § 548 is limited to the value of transfers of property to Bradford during the one year period prior to bankruptcy. Under Counts I through VII, damages encompass a 23 month period and are far in excess of the amount of money paid by Cannon to Bradford.

■ The distinction between the claims asserted and interests protected was noted in *In re Bel–Bel Intern. Corp. v. Barnett Bank of South Florida, N.A.*, 158 B.R. 252 (S.D.Fla.1993). In *Bel–Bel*, creditors of the debtor filed an independent action to recover damages of $7.1 million dollars for fraud, conspiracy, conversion, and other intentional torts. The defendant banks asserted that the claim should be stayed pending the outcome of an appeal from a judgment of $3.5 million dollars in favor of the debtor in possession and against the defendants to recover preferential transfers and fraudulent conveyances, arguing that the plaintiff, as an unsecured creditor entitled to share in any distribution from the estate, would realize a double recovery if defendants were forced to pay both judgments. The district court rejected the notion and found that there was no threat of double recovery because the two theories are different and recovery was not being sought for more than the defendant's full share of potential liability. *Id.* at 256. By analogy, the claim asserted by the Trustee under Count VIII involves a different theory of recovery asserted independent of any prepetition claim which Cannon could have asserted. Accordingly, recovery under Count VIII is not limited by recovery realized under Counts I through VII.

Based on the foregoing authority, the Court finds that the Trustee is entitled to recover under 11 U.S.C. § 548 the amount of $1,137,500 for the fraudulent transfers made to the defendant during the one year period prior to bankruptcy.

## H. PREJUDGMENT INTEREST

Federal law determines whether to apply prejudgment interest to any award under a federal statute, *see Blau v. Lehman*, 368 U.S. 403, 414, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962), while Tennessee law determines whether prejudgment interest is appropriate for any award based on the common law fraud, breach of fiduciary duty, negligent supervision, or the statutory TCPA claims. *See Bailey v. Chattem, Inc.*, 838 F.2d 149, 152 (6th Cir.), *cert. denied*, 486 U.S. 1059, 108 S.Ct. 2831, 100 L.Ed.2d 931 (1988).

Under federal law, the allowance of prejudgment interest on damages, while not an absolute right, is ordinarily awarded, absent some justification for withholding it. *U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1256–57 (10th Cir.1988); *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 115 S.Ct. 2091, 2096, 132 L.Ed.2d 148 (1995). The CFTC and federal district courts generally allow recovery of prejudgment interest in antifraud cases under § 4b and § 4o of the CEA. *See Ruddy v. First Commodities Corp. of Boston*, 1981 WL 26101, [1980–1982 Transfer Binder] Comm. Fut. L. Rep. ¶ 21,435, at 26,086 n.18 ("Where such awards are clearly compensatory, and, as here, involve the breach of a fiduciary duty, prejudgment interest, while a matter of discretion, ***should hereafter be the rule rather than the exception.***" (emphasis added)); *Strobl v. New York Mercantile Exch., Inc.*, 590 F.Supp. 875 (S.D.N.Y.1984); *see generally* Susan K. Freund, William E. McDonnell, Jr., and Hugh J. Cadden, *Prejudgment Interest in Commodity Futures Litigation*, 40 Bus. Law. 1267, 1275 and n.63 (1985) ("Regarding the rate of prejudgment interest awarded in federal district court actions brought under the CEAct, ***federal courts usually award prejudgment interest based upon the legal rate of the forum state.***" (emphasis added)); *cf. Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946).

In relation to the Trustee's state statutory and common law claims, "[t]he award of prejudgment interest is within the sound discretion of the trial court and the decision will not be disturbed by an appellate court unless the record reveals a manifest and palpable abuse of discretion." *Spencer v. A–1 Crane Service, Inc.*, 880 S.W.2d 938, 944 (Tenn. 1994) (citing *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 446 (Tenn.1992); *Kirksey v. Overton Pub., Inc.*, 804 S.W.2d 68,

73 (Tenn.App.1990)); *see also Squibb v. Smith*, 948 S.W.2d 752, 757 (Tenn.App.1997); *see generally* 2, *Dobbs Law of Remedies*, § 8.3 (1993). Under the particular facts of this case, prejudgment interest is warranted in order to compensate the estate for the time value of money while Bradford retained the benefits of its fraud. Compensatory damages in the amount of Cannon's gross or net trading losses will not compensate the estate for the time value of money. Accordingly, under the foregoing authority, the Trustee is entitled to prejudgment interest.

■ The Trustee is also entitled to prejudgment interest on his fraudulent conveyance claim. *See In re Acequia, Inc.*, 34 F.3d 800 (9th Cir.1994). Some courts have allowed interest from the date of the transfer, if fraud is involved. *See, e.g., In re Independent Clearing House Co.*, 41 B.R. 985, 1015–16 (Bkrtcy.D.Utah 1984) (citing *Jackson v. Star Sprinkler Corp.*, 575 F.2d 1223 (8th Cir.1978)), *aff'd in part and rev'd in part*, 77 B.R. 843 (D.Utah 1987). Other courts have allowed interest to run from the date suit was filed. *In re Shape, Inc.*, 176 B.R. 1. (Bankr.Me.1994). With respect to interest rates, some courts have looked to state prejudgment interest statutes while others have looked to federal law post-judgment interest statutes. *Compare In re Stephen Douglas, Ltd.*, 174 B.R. 16, (Bankr.E.D.N.Y.1994) (applying New York prejudgment interest statute); *In re Suburban Motor Freight, Inc.*, 124 B.R. 984 (Bankr.S.D.Ohio 1990) (applying 52–week T–Bill rate); *In re Southern Indus. Banking Corp.*, 87 B.R. 518, 523 (Bankr. E.D.Tenn.1988) (applying § 1961 post-judgment rate, but noting that selection of rate was discretionary with court).

Although neither the CFTC nor the federal courts have established a uniform starting point for prejudgment interest, this Court selects the date upon which Cannon's account was closed as the most appropriate date for prejudgment interest to attach. *See Kuhland, supra*, at 31,951 (applying without analysis date trading relationship terminated);

*compare Doud v. Shearson Loeb Rhoades, Inc.*, [1984–1986 Transfer Binder] ¶ 22,706, at 30,995 (commencing interest from separate dates of deposit of funds into account).

Under Tennessee law, all prejudgment interest awards are computed at a maximum rate of 10% per annum. *See* T.C.A. § 47–14–123.[77] Under 28 U.S.C. § 1961(a), prejudgment interest is calculated by taking the average accepted auction price for the last auction of the 52–week T–Bill immediately prior to the effective commencement date of the interest award. *See ibid.* Any prejudgment interest award calculated under § 1961(a) would be substantially less than it would be if calculated at the maximum rate allowable under T.C.A. § 47–14–123. Since the federal courts favor the maximum recovery allowable by law when federal and state remedies overlap, *Grogan*, 806 F.2d at 839, the trustee is awarded interest under T.C.A. § 47–14–123. See id.; *cf. Strobl*, 590 F.Supp. at 882.

### PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW RE COMPLAINT FOR MONEY DAMAGES & TO RECOVER FRAUDULENT TRANSFERS–COUNTS I–VII

With respect to Counts I through VII, this Court recommends that the District Court enter judgment in favor of the Trustee and against the Defendants, jointly and severally, for compensatory damages in the amount of $2,361,736, plus prejudgment interest at 10% since February 10, 1994, and punitive damages in the amount of $5,000,000, or such other amount as the court deems proper to deter Defendants' fraudulent conduct in the future.

### ORDER RE COMPLAINT FOR MONEY DAMAGES AND TO RECOVER FRAUDULENT TRANSFERS–COUNT VIII

It is therefore **ORDERED** that the allegation made by the Plaintiff in his complaint

---

77. "Prejudgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the state as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum...."

with respect to Fraudulent Transfers is **SUSTAINED**.

It is **FURTHER ORDERED** that a judgment against the Defendants, J.C. Bradford & Co., J.C. Bradford Futures and Charles Ross, shall be entered in the amount of $1,137,500, plus prejudgment interest at 10% since February 10, 1994.

**IT IS SO ORDERED.**